986 So.2d 95 (2008)
Veronica Fischer, Wife of/and Carroll FISCHER
v.
John W. MEGISON, M.D.
No. 07-CA-1023.
Court of Appeal of Louisiana, Fifth Circuit.
May 27, 2008.
*96 William W. Hall, William W. Hall & Associates, and Kenneth V. Ward, Jr., Law Offices of Kenneth V. Ward, Metairie, Louisiana, for Plaintiffs/Appellants.
Jacqueline H. Blankenship, Chehardy, Sherman, Ellis, Murray, Recile, Griffith, Stakelum & Hayes, L.L.P., Metairie, Louisiana, for Defendant/Appellee.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and WALTER J. ROTHSCHILD.
THOMAS F. DALEY, Judge.
The plaintiffs have appealed the trial court judgment in favor of the defendant in this medical malpractice case. For the reasons that follow, we affirm.

FACTS:
The plaintiffs, Veronica Fischer and her husband, Carroll Fischer, filed suit against Dr. John Megison alleging he was negligent in his evaluation of her complaints of a breast mass, which resulted in his failure to timely diagnose her breast cancer.
At trial, Ms. Fischer, a registered nurse, testified that in July 1999 she called her gynecologist, Dr. Megison, after she discovered a lump during a self breast examination. Ms. Fischer testified that she spoke to Linda at Dr. Megison's office, who stated she would speak to Dr. Megison and he would call her back. Ms. Fischer testified that no one from the office called her back so she telephoned Dr. Megison's office again to ask about scheduling a mammogram. Ms. Fischer testified that a nurse named either Linda or Earlene called back to give her the date for a mammogram. Ms. Fischer testified that on July 14, 1999, she went to Lakeside hospital and had a screening mammogram. She spoke to the receptionist and the technician and told both women that she had a lump in her left breast. Ms. Fischer testified that she called Dr. Megison's office three times to get the results of the mammogram. She spoke to a nurse who told her the mammogram was "clear." Ms. Fischer testified that she later got a letter from Lakeside stating the mammogram was normal. Ms. Fischer testified that the lump persisted so she made an appointment to be examined by Dr. Megison on September 29, 1999. Ms. Fischer testified that when she presented to the office, she told the nurse, Patty, that she had a lump in her left breast. Ms. Fischer testified that Dr. Megison palpated her breasts and she showed him where she felt a lump. Ms. Fischer testified that Dr. Megison told her this was fibrocystic dense breast tissue and she had no masses. Ms. Fischer testified that she told Dr. Megison she wanted an ultrasound of this breast and he responded that this was not necessary and she was "over reacting."
*97 Ms. Fischer testified that in June 2000 she went to an urologist, Dr. Ralph Sagrera, because her bladder prolapsed. Dr. Sagrera noted a pelvic mass and referred her back to Dr. Megison. Ms. Fischer testified that she went to Dr. Megison who noted the pelvic tumor, but after examining her breasts told her that her breasts were "clear." Dr. Megison referred Ms. Fischer to a surgeon who removed the pelvic mass. The mass was identified as ovarian cancer and the tests showed that it had metastasized from another site. Various tests were performed to determine primary site of the tumor; when these were negative another mammogram was performed. This mammogram, performed on June 20, 2000 showed a large breast mass. Ms. Fischer testified that this mass was in the same location as the lump she showed to Dr. Megison in September 1999.
Ms. Fischer testified that she was referred to Dr. Alan Stollier, a breast surgeon. Dr. Stollier explained that she needed chemotherapy to reduce the size of the tumor before a mastectomy could be performed. At that point, Ms. Fischer was referred to Dr. Elmongy, an oncologist. Ms. Fischer testified that she underwent chemotherapy treatments from July until November 2000. On November 15, 2000, Dr. Stollier performed the mastectomy. At that time, she had involvement in 13 lymph nodes. Ms. Fischer described her chemotherapy and radiation therapy. At the recommendation of Dr. Elmongy, Ms. Fischer traveled to Denver where she underwent a stem cell transplant.
On cross examination, Ms. Fischer was questioned about the representation in the submission to the medical review panel that she presented to Lakeside hospital to obtain a mammogram on her own accord, rather than having been referred by Dr. Megison's office. Ms. Fischer testified that she may have misstated these events to her attorney who prepared the submission. She was also questioned about medical records that stated the length of time the lump was in her breast was questionable and a notation by another physician that the lump had been present for two years. Ms. Fischer denied making these statements to any physicians.
Ms. Fischer's daughter, Lindsey, testified that she accompanied her mother to the September 29, 1999 office visit. Her testimony corroborated that of her mother.
Ms. Fischer's husband, Carroll Fischer, testified that Ms. Fischer told him about the abnormality in her left breast in the summer of 1999. Mr. Fischer testified that he felt this area and noticed it felt "different." He was aware the mammogram was reported as being normal and he felt an ultrasound should have been performed.
Dr. C. Paul Sinkhorn, who was accepted by the court as an expert in obstetrics and gynecology, testified on behalf of plaintiffs. Dr. Sinkhorn testified that if he had a patient who presented with a lump that he could not palpate and a normal mammogram, he would order a diagnostic mammogram and an ultrasound. Dr. Sinkhorn explained that a diagnostic mammogram is more intense and has more views than a screening mammogram. Dr. Sinkhorn explained that when a patient has changes in one breast that were not present in the other breast he gets "suspicious." Dr. Sinkhorn testified that Dr. Megison breached the standard of care in his treatment of Ms. Fisher and this resulted in a delay in the diagnosis of breast cancer. Dr. Sinkhorn testified that Dr. Megison breached the standard of care by: (1) not documenting the July 1999 phone call and the order for a mammogram and by not documenting Ms. Fischer's complaints of a breast lump during the September 29, 1999 office visit; (2) *98 not telling Ms. Fischer to come in to be examined when she called his office to state she had a lump in her breast in July 1999; (3) during the September 29, 1999 visit Dr. Megison noted the difference between the breasts when he documented "fibrocystic on L" as this is a danger signal; and (4) not referring Ms. Fischer for a second opinion during the September 29, 1999 office visit. Dr. Sinkhorn testified that had the breast cancer been diagnosed earlier, Ms. Fischer would have had a better prognosis, less toxic chemotherapy, a less disfiguring surgery, and the stem cell transplant could have been avoided. Dr. Sinkhorn also pointed out that during the June 2000 office visit, Dr. Megison recorded that there were no breast masses; however, days later, Dr. Elmongy noted an eight centimeter mass in the left breast and shortly thereafter, Dr. Stollier noted a five centimeter thickening in the left breast. Dr. Sinkhorn was questioned about a May 31, 1999 CT scan of Ms. Fischer's pelvis in which a three centimeter cysts is identified. Dr. Sinkhorn opined that in a pre-menopausal such as Ms. Fischer this was a normal finding because the ovary produces cysts during ovulation.
Dr. Mohamed Elmongy testified as Ms. Fischer's treating oncologist. He explained that a diagnostic mammogram is needed when there is something suspicious during a breast examination. Dr. Elmongy explained that when he examined Ms. Fischer in June 2000, the mass in her left breast was easily palpable. He estimated that this tumor would have been present for at least a year. Dr. Elmongy testified that the May 31, 1999 CT scan was not diagnostic of any condition because it is not specific enough. Dr. Elmongy explained the stem cell transplant as a key part of Ms. Fischer's recovery. He opined that had she been diagnosed earlier, she may not have needed the transplant.
Dr. Benjamin Weinberger, an expert in medical oncology and hematology, testified on behalf of plaintiff. Dr. Weinberger testified that when Ms. Fischer called Dr. Megison's office with complaints of a lump in her breast, Dr. Megison should have had her come to the office to be examined and then ordered a diagnostic mammogram. Dr. Weinberger explained that a delay in diagnosis meant Ms. Fischer had more advanced disease requiring more complex treatment plus the transplant. He opined that had a diagnostic mammogram been ordered in July or September 1999, more likely than not the cancer would have been diagnosed at that time. He further testified that it was more likely than not that the ovarian mass was not present at that time based on Dr. Megison's negative pelvic exam. Dr. Weinberger testified that had Ms. Fischer been diagnosed in 1999, she could have had the option of a lumpectomy rather than a mastectomy, could have had less aggressive chemotherapy, and would not have needed the transplant. Dr. Weinberger testified that the cyst noted on the May 31, 1999 was not related to the mass that was removed from Ms. Fischer's pelvis in June 2000. He opined that it was possible for a six centimeter ovarian mass to develop in eight months.
Dr. Megison was called to the stand by the plaintiff and questioned under cross-examination. Dr. Megison testified that if a patient called his office to report a breast lump, he had the patient come in to be examined then determines whether a diagnostic mammogram needs to be done. He explained that if a patient complains of a lump and his examination is normal, he suggests the patient get a second opinion. Dr. Megison testified that the record does not indicate that Ms. Fischer called his office to report a breast lump. He explained that he had standing orders at *99 Lakeside for his patients to have screening mammograms. Dr. Megison testified that a further workup is only performed if a screening mammogram shows a "nodule." Regarding the September 29, 1999 visit, Dr. Megison testified that the area next to patient's complaints was blank because there were no complaints of a breast mass. He testified that her examination was negative except for fibrocystic breasts. Dr. Megison acknowledged that he noted she had no breast masses on June 7, 2000 and 13 days later Dr. Wells noted an immobile mass in the left breast.
Patricia Rieth testified that she worked in Dr. Megison's office for 27 years. In 1999, her job was to answer the phones. She explained that if a patient called with a problem, she wrote it in a book with the patient's name, phone number, and a medical assistant returned the call. Ms. Rieth testified that she never set up a mammogram for a patient, nor had she ever been told to call a patient to tell them of the date and time for a mammogram. Ms. Reith testified that there was not a nurse or medical assistant named Linda working in Dr. Megison's office in July 1999.
Dr. Benny Nobles, who was accepted by the court as an expert in obstetrics and gynecology, testified on behalf of the defendant. Dr. Nobles testified that he served on the medical review panel in this matter and found Dr. Megison met the standard of care. His opinion had not changed. Dr. Nobles testified that if a patient complains of a breast lump and he does not palpate the lump and there is a normal mammogram, he will reassure the patient and tell them to get another mammogram in six months to a year depending on their age.
Dr. Nobles explained that the type of cancer Ms. Fischer had, lobular carcinoma, differs from other types of breast cancer in that it is diffused across the breast and does not typically form a hard round mass. Dr. Nobles testified that an ultrasound is only ordered if the physician finds something on physical examination or if the radiologist notes something on the mammogram.
Dr. Alan Stolier, who was accepted by the court as an expert in oncologic breast surgery, testified as to the characteristics of lobular carcinoma. He explained that many times this cancer is not visible on imaging particularly on a mammogram and it does not present with a discrete mass. Instead, it presents with a vague thickening, which is a fullness in the breast in which he is unable to define the beginning or end. He agreed that ultrasound is superior to a mammogram in detecting lobular carcinoma, however, ultrasound cannot clearly identify the extent of the cancer. Dr. Stolier agreed that it is more difficult to diagnose breast masses using a mammogram when the patient has dense breast tissue, as did Ms. Fischer.
Although Dr. Stolier had no independent recollection of Ms. Fischer's first visit to his office, he testified that he recorded she had an 18 month history of a mass in her left breast that was unchanged. While Ms. Fischer testified that she had told Dr. Stolier that she had two friends diagnosed with breast cancer in the past 18 months and perhaps this is why Dr. Stolier wrote that her lump had been present for 18 months, Dr. Stolier testified that he would not have recorded that the patient's friend had cancer.
Dr. Stolier testified that Ms. Fischer's cancer had been present for years prior to the diagnosis. He stated there was no way to know the size of the tumor in September 1999. He explained that Ms. Fischer underwent preoperative chemotherapy to decrease the chance of spreading the disease surgically. Dr. Stolier testified that it was more likely than not that *100 Ms. Fischer would have required pre-operative chemotherapy as well as a mastectomy if the cancer had been diagnosed eight months earlier.
Dr. Michael Hanemann, who was accepted by the court as an expert in radiology, testified that he served on the medical review panel in this case. He explained that in finding there was no breach of the standard of care in this case, the panel relied on the absence of documentation of the patient's complaint of a lump at the time of the July 1999 mammogram. Dr. Hanemann explained that the mammogram tech interviews the patient and if the patient reports a problem, this would be brought to the attention of the radiologist. He opined that if Ms. Fischer had complained of a lump, this would have been noted on the mammogram form. Dr. Hanemann testified that not everything that is felt by the patient or the doctor is considered suspicious once a negative mammogram has been obtained.
Dr. William Wells, testified that he was the only radiologist at Lakeside hospital in 1999. He testified that if a patient informed the receptionist they had a breast lump, a screening mammogram would not be performed; rather the referring physician would be called to obtain an order for a diagnostic mammogram. He testified that in addition to the receptionist questioning the patient, the tech would also ask the patient about any problems. He reviewed the forms from Ms. Fischer's July 1999 mammogram and noted neither of the forms indicates she complained of a problem. Dr. Wells interpreted Ms. Fischer's mammogram films in 1999 and 2000. Dr. Wells testified that lobular carcinoma is notoriously difficult because it does not present with a discrete mass and can be large and undetectable at the same time. Dr. Wells noted the June 2000 ultrasound showed only a suspicious area rather than a discrete mass. Dr. Wells was unable to state whether this suspicious area would have been present had an ultrasound been performed in July 1999.
Dr. Michael Finan testified that Dr. Megison referred Ms. Fischer to him for a pelvic mass. On June 14, 2000, he performed surgery on Ms. Fischer to remove the mass. He described the mass as being both cystic and solid. Since the pathology report stated this mass was metastatic cancer from another site, he looked for cancer in the gastrointestinal tract, liver, and pancreas. Dr. Finan stated that if Ms. Fischer had told him she had a breast mass, he would have recorded this complaint. Dr. Finan testified that it was more likely than not that the mass he removed from Ms. Fischer's pelvis in June 2000 was the same cyst that was identified on the May 31, 1999 CT scan.
The deposition of Dr. Eva Thomas of M.D. Anderson Cancer Center was admitted into evidence by the defendant. Dr. Thomas testified that she examined Ms. Fischer, who came to M.D. Anderson for a second opinion regarding treatment options. Dr. Thomas explained that lobular cancers are extremely difficult to palpate and diagnose even using mammography and ultrasound. Dr. Thomas testified that she informed Ms. Fischer that there were no other standard treatments in addition to what she was receiving. Dr. Thomas stated that M.D. Anderson does not recommend stem cell transplant because the studies show no difference in overall survival between patients who are treated with standard doses of chemotherapy and high-dose chemotherapy with stem cell transplant. Dr. Thomas explained that the size of the tumor and number of lymph nodes involved determines the overall outcome for a cancer patient. Because these factors were not known in 1999 she was unable to state what the survival rate *101 would have been if Ms. Fischer had been diagnosed earlier. She specifically testified that it is impossible to know if an earlier diagnosis would have given Ms. Fischer a better outcome; however, Ms. Fischer would have required pre-operative chemotherapy and a mastectomy even with an earlier diagnosis.
The deposition of Dr. Steven Rosen, a medical oncologist and hematologist at the Northwestern University Medical School in Chicago, was admitted into evidence by the defendant. Dr. Rosen testified that the delay in diagnosis did not alter Ms. Fischer's prognosis. Dr. Rosen stated that the ovarian mass noted on the May 31, 1999 CT scan indicates there was stage IV breast cancer at that time. He opined that the original disease may have occurred years before the tumor was detected. Dr. Rosen testified the treatment would have been the same whether she was diagnosed in May 1999 or June 2000 because in both instances she had stage IV breast cancer with pelvic metastases. Dr. Rosen opined that there was lymph node involvement in July 1999 based on the mass noted on the May 1999 scan. Dr. Rosen stated that in 2000, high dose chemotherapy with stem cell transplant for lobular carcinoma of the breast was considered investigational as there was no evidence that this treatment was more effective than traditional chemotherapy and hormonal regimes.
At the conclusion of trial, the judge took the matter under advisement. She then rendered judgment finding plaintiffs failed to prove by a preponderance of the evidence that Dr. Megison breached the standard of care, specifically finding: (1) that the evidence does not support the conclusion that Ms. Fischer reported a mass to Dr. Megison on more than one occasion, (2) there was insufficient evidence that Dr. Megison breached the standard of care during the September 29, 1999 office visit, (3) that Dr. Megison did not breach the standard of care in failing to diagnose this cancer, (4) that this cancer had more than likely been present for several years, and the ovarian mass had been present for longer than eight months. Plaintiffs filed this timely appeal.

LAW AND DISCUSSION:
In a medical malpractice action against a physician the plaintiff has the burden of proving (1) the degree of care ordinarily practiced by physicians in the defendant physician's specialty, (2) that the defendant either lacked this degree of skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and (3) that as a proximate result of the breach the plaintiff suffered injuries that would not otherwise have been incurred. LSA-R.S. 9:2794(A). The applicable standard of care is determined from the particular facts and circumstances of each case, including the evaluation of the expert testimony. Tarbutton v. St. Paul Fire & Marine Ins. Co., 35,362 (La.App. 2 Cir. 12/5/01), 803 So.2d 273. The evaluation of conflicting expert opinions in relation to all the circumstances of the case, as well as credibility determinations of all witnesses are factual issues to be resolved by the trier of fact, which will not be disturbed on appeal in the absence of manifest error. Id. When the medical experts express opposing opinions on whether the standard was met in any given case, the reviewing court shall give great deference to the trier of fact's evaluations. Id. An appellate court may not re-weigh the evidence or substitute its own factual findings for those of the trial court even though it may have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270.
*102 On appellate review, when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). An appellate court may only reverse a factfinder's factual determination if after reviewing the record in its entirety, the appellate court finds that (1) a reasonable factual basis does not exist for the factfinder's determination, and (2) the record establishes that the factfinder is clearly wrong or manifestly erroneous. Salvant v. State, 05-2126 (La.7/6/06), 935 So.2d 646.
On appeal, plaintiffs argue the trial court erred in finding that Dr. Megison met the standard of care, asserting that this finding is contrary to the evidence and law. We disagree.
While plaintiffs' expert, Dr. Sinkhorn, testified that Dr. Megison fell below the standard of care, defendant's expert, Dr. Nobles testified that Dr. Megison met the standard of care. In support of their position, plaintiffs focuses on Dr. Nobles testimony wherein he states that he prefers to use the term "guidelines" rather than "standard of care." However, plaintiffs ignore Dr. Nobles' testimony wherein he responded affirmatively to the question "does it remain your opinion that the defendant, Dr. Megison, maintained the applicable standard of care required by gynecologist in his treatment of Mrs. Fischer." Dr. Nobles testified that he was not aware of any differences in the standard of care between a gynecologist practicing in Riverside, California (Dr. Sinkhorn's home) and Kenner, Louisiana. Our review of Dr. Nobles' testimony indicates that when he stated he preferred to use the term guidelines, he explained that in some areas of the country the gynecologist may take complete care of the patient, including performing the biopsy, then referring the patient, while some gynecologist may even perform surgery. Dr. Nobles testified that in a patient with a breast lump that is palpated by the doctor, the follow up treatment is the same, but whether the gynecologist or a referring physician performs the follow up varies in different areas of the country. Dr. Nobles testified that in his practice, when a patient complains of a lump, they evaluate the patient with a complete physical exam, history, and then refer for either a mammography or evaluation by a surgeon. Dr. Nobles testified that given a normal mammogram and a lump reported that is not palpated by the doctor, "we would have a follow up in one year." Dr. Nobles explained that an ultrasound is only ordered when the doctor palpates a lump or if there is a suspicious finding on the mammogram.
Further, Dr. Sinkhorn's opinions were based on his belief that in July 1999 Ms. Fischer called Dr. Megison's office to report the breast lump and again told Dr. Megison of the lump in the September 1999 office visit. The trial court noted the conflict in testimony and documentary evidence concerning Ms. Fischer's calls to Dr. Megison's office regarding the lump and the scheduling of the mammogram. While Ms. Fischer testified that she called Dr. Megison's office to schedule the mammogram, the trial court noted that in the medical review panel submission, plaintiff stated that she obtained the mammogram on her own. Also, the testimony of Dr. Megison's long time receptionist was that she never scheduled a mammogram for a patient or called a patient to tell them when their mammogram is scheduled. Additionally, while Ms. Fischer maintains that she reported the lump to both the receptionist and the mammography technologist, this is not reflected in the records. Moreover, the trial court specifically found that Dr. Megison's testimony regarding the September *103 1999 office visit was credible. Dr. Megison's testimony and office note reflects that a breast examination was performed. He noted fibrocystic changes on the left. There was overwhelming testimony that lobular carcinoma is very difficult to diagnose because it does not present with a well defined mass, rather, it is diffused across the breast and is very difficult to detect on mammography and ultrasound.
In addition, there is sufficient evidence to support the trial court's finding that Ms. Fischer's cancer had more likely than not been present for several years. Dr. Finan testified that the malignant ovarian mass he removed from Ms. Fischer's pelvis was more likely than not the same mass that was identified on the May 31, 1999 CT scan. Dr. Stolier testified that the cancer was probably present for years prior to the diagnosis. Even plaintiffs' expert, Dr. Weinberger was only willing to say that it was possible that the six centimeter solid mass developed on the ovary in eight months, but he could not say how. Thus, there is sufficient evidence to support the trial court's finding that Dr. Megison did not breach the standard of care in his treatment of Ms. Fischer. This finding makes a discussion of causation and damages moot.

CONCLUSION:
The testimony of all the witnesses in this case provides a reasonable factual basis for the trial court's finding that Dr. Megison did not breach the standard of care. Having found no manifest error on the part of the trial court, the judgment of the trial court is affirmed.
AFFIRMED.