**DAVID GNIADY**       *      **NO. 2023-CA-0215**

**VERSUS**       *

**OCHSNER CLINIC**       *      **COURT OF APPEAL**

**FOUNDATION**      **FOURTH CIRCUIT**

      *

      **STATE OF LOUISIANA**

    *** * * * * * ***

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2017-11897, DIVISION "A"
Honorable Ellen M. Hazeur, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Paula A. Brown, Judge Dale N. Atkins, Judge Nakisha Ervin-Knott)


Harry E. Forst
639 Loyola Avenue, Suite 1830
New Orleans, LA 70113


     COUNSEL FOR PLAINTIFF/APPELLANT, David Gniady


Peter E. Sperling
Halley S. Carter
FRILOT L.L.C.
3700 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-3700


     COUNSEL FOR DEFENDANT/APPELLEE, Ochsner Clinic Foundation


                **AFFIRMED**
          **DECEMBER 28, 2023**

DNA

PAB

NEK

This is a medical malpractice action. Appellant, David Gniady ("Mr. Gniady"), seeks review of the trial court's November 23, 2022 judgment, which denied his "Motion for Judgment Notwithstanding the Jury Verdict [and/or] Motion for a New Trial" ("Motion for JNOV/New Trial") and dismissed his medical malpractice claims against Appellee, Ochsner Clinic Foundation ("Ochsner"), with prejudice. For the following reasons, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

*Petition for Damages*

On December 12, 2017, Mr. Gniady filed a "Petition for Damages" ("Petition") in Orleans Parish Civil District Court. Therein, he named Ochsner as a defendant and stated that during certain events and times described in his Petition, he received medical treatment from Dr. Samuel Colby Danna ("Dr. Danna")[1] at the Ochsner Clinic Foundation-Baptist Campus ("Ochsner Baptist"). Mr. Gniady contended that, as the employer of Dr. Danna, Ochsner was liable for Dr. Danna's

---

[1] According to the brief Mr. Gniady filed with this Court, Dr. Danna was Mr. Gniady's primary care physician. The record reveals that Dr. Danna specializes in internal medicine.

1

actions under the theory of respondeat superior. Thereafter, Mr. Gniady outlined the series of events which he alleged constituted medical malpractice.[2]

In his Petition, Mr. Gniady explained that he ran for four miles on September 30, 2015, after which time "he suffered severe chest pain which he had never experienced before" and which felt "like a strong cramp." Mr. Gniady further explained that "after walking for a bit, the pain went away." However, according to his Petition, Mr. Gniady went on a two-mile run the next day, October 1, 2015, after which "the same thing happened" as the day prior, i.e., "a severe chest pain that resembled a cramp" that "after walking a bit . . . went away." Then, on October 4, 2015, Mr. Gniady attended a New Orleans Saints football game and "had another episode of severe chest pain" while walking up a ramp to reach his seat. According to his Petition, Mr. Gniady "was able to walk to his seat[;]" and "[t]he pain . . . subside[d,] and he watched the game."

As explained in his Petition, thereafter, on the morning of October 5, 2015, Mr. Gniady attempted to contact his doctor, Dr. Danna, but could not reach Dr. Danna's office directly, so Mr. Gniady used "the Ochsner Medical Center [call] service" and "asked to see [Dr. Danna] as soon as possible." Mr. Gniady's Petition

---

[2] Prior to filing his Petition, Mr. Gniady requested that a medical review panel look into the care he received from Dr. Danna. *See* La. R.S. 40:1231.8(A)(1)(a) (providing, in pertinent part, that "[a]ll malpractice claims against health care providers . . . shall be reviewed by a medical review panel . . . .").

The panel convened on October 2, 2017. In his brief, Mr. Gniady explains that two members of the panel concluded that Ochsner and Dr. Danna did not breach the standard of care in treating Mr. Gniady; but the third member of the panel, Dr. Robert Songy ("Dr. Songy"), concluded that the evidence did support the conclusion that Ochsner and Dr. Danna failed to adhere to the appropriate standard of care as alleged in Mr. Gniady's Petition. According to the record, Dr. Songy did not testify at the trial held in this matter because he died prior to the trial.

stated that he received a response that the earliest Dr. Danna could see Mr. Gniady was the morning of the next day, October 6, 2015. Mr. Gniady summarized his visit with Dr. Danna in his Petition:

> The doctor examined him, listened to his heart, and did an EKG[3] on him. After the examination, Dr. Danna stated that he did not see anything that caused him to be alarmed. He said there were some minor abnormalities in his EKG, it was abnormal, but they were not the cause for any immediate concern. Dr. Danna recommended that he have a stress test done the following week to see whether they could determine the exact cause of the pain. Mr. Gniady was sent home. Dr. Danna did not suggest that he go to the emergency room nor did he suggest that he immediately see a cardiologist or immediately refer him to another doctor despite that he presented with cardiac symptoms and an abnormal EKG.

According to Mr. Gniady's Petition, at approximately 11:10 p.m. on October 6, 2015 (the same day as his appointment with Dr. Danna), Mr. Gniady "experienced a severe pain in the middle of his chest" like the pain he had experienced on the three prior occasions "but much more painful" and "very intense." Mr. Gniady's Petition stated that his family contacted emergency medical services, who transported Mr. Gniady to Ochsner Baptist.

Per Mr. Gniady's Petition, when Mr. Gniady arrived at Ochsner Baptist, Dr. Siddharth Bhansali ("Dr. Bhansali") was the cardiologist who treated Mr. Gniady and operated on him to "put a stent into his heart and relieve the blockage since he had experienced a severe heart attack." Mr. Gniady's Petition explains that he

---

[3] We take judicial notice that "EKG" or "ECG" stands for "electrocardiogram," which "is a simple, painless, and quick test that records [the] heart's electrical activity." *Electrocardiogram: What is an electrocardiogram (EKG) test?* NATIONAL LIBRARY OF MEDICINE, https://medlineplus.gov/lab-tests/electrocardiogram/. *See Vescovo v. Air & Liquid Sys. Corp.*, 2023-0116, p. 10 (La. App. 4 Cir. 11/15/23), ___ So.3d ___, ___, n.7, 2023 WL 7638681, at *5 (holding that "[t]his Court can take judicial notice of government websites") (citing *State in Interest of K.B.*, 2023-0409, p. 4 (La. App. 4 Cir. 9/26/23), 372 So.3d 864, 872 n.12).

spent twelve days in the intensive care unit ("ICU") of the hospital and was released from the ICU on October 19, 2015, after which time he spent an additional five days in the hospital before returning home. However, according to Mr. Gniady's Petition, Mr. Gniady began to experience "issues with fluid building up around his heart," for which he had to spend another five days in the hospital.[4] The Petition further stated that Mr. Gniady "ha[d] not returned to his normal work routine," that he "suffer[ed] with shortness of breath," and that "he continue[d] to follow up with Dr. Bhansali."

In his Petition, Mr. Gniady asserted that Ochsner acted negligently and breached the standard of care (via its employee Dr. Danna) in the following ways:

1. When Mr. Gniady made his initial call to the Ochsner Medical service complaining of chest pain, he should have been advised and routed to go to the emergency room immediately.

2. On October 6, 2015, when he saw Dr. Danna, Dr. Danna should have sent him with a history of chest pain and abnormal E[K]G, to the emergency room.

3. The patient presented with symptoms and an abnormal EKG that should have prompted immediate referral.

3. [sic] Dr. Danna should have had the EKG that he had run, read by a cardiologist immediately and he should have had a cardiology consult immediately on October 6, 2015.

4. The EKG was read at a resting heart rate and the doctor should have asked him to walk around to increase his heart rate before administering the EKG.

5. The doctor could have also done a cardiac enzyme test in his office.

---

[4] Mr. Gniady's Petition also states that on February 12, 2016, Mr. Gniady underwent a second heart surgery, during which he received four stents. However, we note that Dr. Bhaslani testified at the trial in this matter that this surgery was "[n]ot at all" related to Mr. Gniady's October 2015 heart attack.

6.  The E[K]G showed he had inverted T-waves in leads VI, V2, and biphasic in V3, which was indicative of "Wellen's Syndrome".[5] This should have alerted Dr. Danna that Mr. Gniady was at a greater risk to have a heart attack within the next few days to weeks and should have been sent immediately to the emergency room.

Mr. Gniady asserted that, as a result of the above negligent actions and breaches of the standard of care, "his heart sustained permanent damage with an ejection fraction of 38%-40%[;]" he "suffer[ed]with congestive heart failure, shortness of breath, and [an inability] to do even simple physical task[s;]" and that "[h]is life may well have been shortened as a result of this incident."

### *August 2022 Jury Trial*

This matter ultimately proceeded to a jury trial that commenced on August 15, 2022, and concluded on August 19, 2022. In pertinent part, the jury heard testimony from Dr. Lee Fischer ("Dr. Fischer"), Dr. Danna, Dr. Frank Wilkow ("Dr. Wilkow"), and Dr. Christopher Lege ("Dr. Lege). The jury also watched the video depositions of Dr. Gary Tamkin ("Dr. Tamkin"), Dr. Bhansali, and Dr. Joseph Klapper ("Dr. Klapper").

### *Mr. Gniady's Case-in-Chief*

*Dr. Fischer*

First, Mr. Gniady called Dr. Fischer as a witness, and Dr. Fischer testified that he was a board-certified family physician[6] and had been in private practice for

---

[5] We note that Mr. Gniady used "Wellen's Syndrome" in his brief, but elsewhere in the record this is written as "Wellens Syndrome."

[6] When asked whether the practices of internal medicine and family practice overlap, Dr. Fischer responded:

Yes, they do quite a bit. The training might be somewhat different. But if a general internist is in a private office, seeing patients, and following them on a routine basis for a number of years, [they are]

thirty-one years until 2006. Thereafter, from 2006 until 2018, Dr. Fischer explained that he served part-time as a supervising physician at a family medicine residency program. At the time of Mr. Gniady's heart attack in 2015, Dr. Fischer noted that in addition to his role as a supervising physician at the family medicine residency program, he also reviewed medical files for a short- and long-term disability company, and he reviewed medical files and testified in legal matters. Dr. Fischer stated that, at the time of trial, he worked as an independent medical consultant for the Social Security Administration and as an assistant professor, instructor, facilitator, and grader for students at the College of Osteopathic Medicine at Marian University. The trial court accepted Dr. Fischer as an expert in the fields of family practice and primary care.

Dr. Fischer testified that after reviewing Mr. Gniady's medical records and the depositions of Mr. Gniady, Mr. Gniady's wife, one of Mr. Gniady's daughters, and Dr. Danna, his opinion was that Mr. Gniady's chest pain on September 30, October 1, and October 4, 2015, "was consistent with a heart problem, . . . specifically unstable angina" and that "Dr. Danna [should have] recognized" it. Dr. Fischer described unstable angina as a "significant narrowing of one of the main arteries in . . . the chest" and asserted that Mr. Gniady's EKG indicated unstable angina in the exact artery for which Mr. Gniady ultimately required emergency surgery to relieve a blockage. Further, Dr. Fischer opined that Mr. Gniady's EKG was abnormal[7] and that "[e]ven if Dr. Danna did not know the significance of the

doing the same thing as a family doctor. The term came up years ago called "primary care physicians." So it [was not] just a family doctor or an internal medicine doctor, we were kind of all lumped into this name of "primary care physician."

abnormality, he knew it was abnormal." Dr. Fischer contended that, given Mr. Gniady's recent history of pain in the center of his chest during activity and an abnormal EKG, Dr. Danna should have immediately transferred Mr. Gniady to the emergency room, "where further testing [could have] been done and more likely than not prevented [Mr. Gniady] from having the heart attack that he had about 12 hours later." In particular, Dr. Fischer explained that "if somebody has a heart attack or even an impending heart attack, [there are] certain blood tests that will show that." Additionally, Dr. Fischer observed that once a patient is admitted to the emergency room, this presents the option to call in specialists, such as cardiologists. Dr. Fischer alternatively opined that Dr. Danna should have consulted a cardiologist before sending Mr. Gniady home.

Dr. Fischer answered affirmatively when asked whether "the standard of care of an internist, primary care doctor, or family doctor, when seeing a patient with recent chest pains, [is] to assume it is cardiac-related." He explained that this is "[b]ecause if [it is] cardiac-related, . . . [there is] a risk that something very bad can happen like a heart attack or even death." Dr. Fischer agreed that the "differential diagnosis" standard of care requires listing the most dangerous and treatable causes for a patient's chest pain before it can harm the patient. Dr. Fischer testified that if Dr. Danna had prioritized Mr. Gniady's chest pain in performing the differential diagnosis, this would have resulted in a diagnosis of unstable

---

[7] During his testimony, Dr. Fischer reviewed a copy of Mr. Gniady's October 6, 2015 EKG and pointed out what he believed made the EKG abnormal. Dr. Fischer stated that the EKG indicated Mr. Gniady suffered from "Wellens Syndrome," for which the EKG "abnormalities can indicate a significant blockage of the left anterior descending artery, which is exactly what Mr. Gniady had happen to him." Two of Ochsner's experts, Dr. Wilkow and Dr. Lege, disagreed that Mr. Gniady's EKG demonstrated this syndrome.

angina, which constitutes one of three categories of acute coronary syndrome. When asked whether unstable angina can be defined as "recent episodes of chest pain due to reduced blood flow to the heart that is sudden, troublesome, and alarming," Dr. Fischer answered affirmatively, and he stated that unstable angina is a medical emergency.

*Dr. Tamkin*

Next, the jury watched the August 24, 2021 video deposition of Dr. Tamkin, who testified that he was board-certified in emergency medicine and presently worked as "the vice president of [p]rovider [d]evelopment for a company that staffs emergency departments across the country;" as the statewide medical director for the California Highway Patrol; as an expert witness; and as the "medical director [of the emergency department] . . . [at] the Community Hospital in the Central Valley of California." In that latter capacity, Dr. Tamkin explained that, in addition to his administrative duties, he treated patients for approximately fifty hours per month. Dr. Tamkin stated that he also served as a volunteer associate clinical professor of emergency medicine at a university.

Dr. Tamkin's testimony centered on what, hypothetically, would have happened if Dr. Danna had sent Mr. Gniady to the emergency room on October 6, 2015 (i.e., prior to Mr. Gniady experiencing the heart attack at home that evening). Dr. Tamkin opined that if Mr. Gniady had presented to an emergency room on October 6, 2015, and provided the same description of his symptoms and medical history that Dr. Danna had received, a triage nurse would have labeled the nature of his complaint as "high risk" and admitted him. At that point, according to Dr. Tamkin, an emergency physician would have performed a complete physical exam of Mr. Gniady's lungs and heart, including an EKG; a chest X-ray; blood work to

look for the presence of troponin, which Dr. Tamkin described as a substance released by the cells of the heart when the heart is damaged; and a CAT scan.

During his deposition, Dr. Tamkin outlined the three-step approach that he believed an emergency physician takes when faced with a complaint of chest pain. Noting that chest pain is a "very, very common complaint [in] the emergency room" and that "emergency physicians are highly trained in evaluating this complaint," Dr. Tamkin stated that emergency physicians must first determine whether the patient's history indicates that the patient's complaint of chest pain is stemming from his or her heart as opposed to another issue, such as "aortic dissection."[8] In terms of Mr. Gniady's history, Dr. Tamkin testified:

> Mr. Gniady for this really had very classic symptoms of a story that could very likely be [his] heart. The dull, aching nature of the pain, the fact that it was in his chest and was in his arm and his neck, and particularly the fact that it occurred around exertion. So . . . that makes the story, which is the number one most important thing as an emergency physician[,] very concerning that this could be his heart.

In addition to a patient's complaint history, Dr. Tamkin explained that an emergency physician next considers the patient's risk factors for having heart problems in order to determine whether the complaint is related to the patient's heart. Dr. Tamkin stated that Mr. Gniady had risk factors that would have indicated to an emergency physician that his complaints were heart-related, namely his age above fifty-five years (Mr. Gniady was sixty-two on October 6, 2015); gender (males are more at risk of coronary artery diseases); personal history of hypertension; family history of heart disease; and his habit of smoking cigars.

---

[8] Dr. Tamkin listed examples of other possible causes of chest pain as an aorta in the chest; blood clots in the lung(s); pneumonia in the lung(s); irritation of the lung(s); and muscular problems in the chest.

Finally, according to Dr. Tamkin, an emergency physician looks at the patient's EKG to determine if it is normal; and Dr. Tamkin stated that Mr. Gniady's EKG was "abnormal in a way [that is] consistent with somebody having a clogging of their heart vessels."[9] Thus, Dr. Tamkin stated that Mr. Gniady "checked each of the three boxes that a typical emergency physician would look at for . . . deciding whether this is likely [the patient's] heart" and was "a textbook explanation of somebody [who is] having heart pain." Thus, according to Dr. Tamkin, "[a]ll three of these things, including this abnormal EKG, would have led any reasonable emergency physician to get a cardiology consultation and admit this patient for a high risk presentation for heart problems." He stated that even if all of Mr. Gniady's tests had returned normal results, a "standard emergency physician in that setting would then be getting a cardiology consultation" after which time Mr. Gniady likely would have undergone a "cardiac catheterization . . . to look at the health of his heart vessel as soon as" possible. Dr. Tamkin opined that a cardiologist likely would have prescribed preventative medicine to Mr. Gniady.

Dr. Tamkin also testified about the differential diagnosis standard of care and stated that emergency physicians do a differential diagnosis. He described the process:

> A differential diagnosis is the process we go through in evaluating a patient when we lay out essentially the possible diagnoses that this could be. And so, again, based upon a history, a physical and then later diagnostic testing, we lay out both in our brain, and oftentimes in our documents, what [we are] thinking could be possible causes of this chief complaint. And so these are unlisted diagnoses that could explain a patient's presentation, based upon the physician's evaluation

---

[9] During his deposition, Dr. Tamkin reviewed a copy of Mr. Gniady's EKG and pointed out why he deemed it to be "significantly abnormal."

Dr. Tamkin stated that acute coronary syndrome would be "number one . . . in [an] emergency physician's differential diagnosis" of Mr. Gniady.

*Dr. Bhansali*

Following the viewing of Dr. Tamkin's video deposition, the jury watched Dr. Bhansali's August 13, 2021 video deposition. Dr. Bhansali testified that he had been Mr. Gniady's cardiologist since October 7, 2015, on which date an electrocardiogram performed upon Mr. Gniady's arrival at the emergency room confirmed that Mr. Gniady was having "an extensive heart attack." Thereafter, Dr. Bhansali explained that he "took [Mr. Gniady] to the cath lab" where he "identified the culprit vessel [as the left anterior descending coronary artery], . . . [placed] a wire across the blockage, g[o]t a balloon across the blockage[,] and [placed a] stent [in] that particular vessel." When asked about permanent damage to Mr. Gniady's heart as a result of the heart attack, Dr. Bhansali described it as "extensive" and estimated that "probably half of [Mr. Gniady']s heart muscle" had been damaged. During cross-examination, Dr. Bhansali clarified that he was there solely to talk about his treatment of Mr. Gniady, not to serve as an expert witness in terms of whether malpractice had occurred in this matter.

*Dr. Klapper*

After Dr. Bhansali's video deposition, Mr. Gniady next presented Dr. Klapper's August 11, 2021 video deposition. Therein, Dr. Klapper testified that he was a board-certified cardiologist and that he had previously been board-certified in internal medicine too.[10] Dr. Klapper explained that, at the time of his deposition,

---

[10] When asked why he had not renewed his certification in internal medicine, Dr. Klapper explained that he "became incredibly busy in cardiology, and [did not]

he was presently performing telemedicine cardiology services one day a week at a hospital in California, "medical reviews for third parties for appropriateness of care," and medical-legal consulting.

Dr. Klapper stated that, after reviewing Mr. Gniady's medical records, he believed that "Mr. Gniady should have been sent to the emergency room by Dr. Danna . . . for management of unstable angina." He defined "angina" as "a symptom or . . . complex of symptoms or symptom surrogates, usually chest pain or pressure, that is due to a decreased blood flow" and explained that the word "unstable" referred to "some change from [the] previous" situation. In this latter regard, Dr. Klapper stated that the chest pain Mr. Gniady experienced on September 30, October 1, and October 4, 2015, constituted "a suggestion that [there was] something unstable, something new, something different reflecting a problem" and that those three occasions of chest pain were related to his ultimate heart attack. Dr. Klapper testified that these new instances of instability "need[ed] to be addressed in some sort of more urgent setting, where the cause c[ould] be determined and more timely therapy c[ould] be given" because the situation presented an "issue of timeliness."

When asked about Dr. Danna's contention that Mr. Gniady did not report the October 4, 2015 incident of chest pain at his appointment with Dr. Danna on October 6, 2015, Dr. Klapper responded that it "[does not] change the situation" because "[t]he symptoms [we]re new" and "life-threatening." Discussing guidelines from the American College of Cardiology, Dr. Klapper testified that "the guideline is that patients that have suspected acute coronary syndrome . . .

really have a need to get recertified in internal medicine, since being so busy in cardiology."

12

should be referred to the emergency room." Dr. Klapper stated, "[It is] hard to imagine a patient who is suspected to have an acute coronary syndrome, not being sent to the emergency room." In addition to the instances of chest pain, Dr. Klapper stated that Mr. Gniady's age, history of hypertension, gender, cigar-smoking, and abnormal EKG were reasons Dr. Danna should have sent Mr. Gniady to the emergency room. Dr. Klapper opined that if Dr. Danna had sent Mr. Gniady to the emergency room, Mr. Gniady would have had a better outcome and avoided the heart attack.

Thereafter, the following colloquy occurred between Dr. Klapper and counsel for Mr. Gniady regarding the differential diagnosis process:

> [A] [I]n order to make a diagnosis one goes through a list of all the possible causes of the clinical presentation, so . . . the diagnosis is mostly made on history and physical.

> And so a history and a physical are performed, and the physician[] comes up with a list of possibilities, and then goes through a mental checklist. Now, when [you are] in medical school we actually write it out, but -- and a clinician would be able to come up with this list mentally and go through each of those entities and subsequently rule each one out as the cause of the clinical presentation. So the differential diagnosis is the center point. [It is] the . . . basis of the thinking process. [It is] . . . where you use your mind to solve the problem. So the problem is what . . . is wrong with this patient?

> And in order to come to that, to a conclusion and make a diagnosis, one goes through a list. Now, this is done with everybody, every patient that shows up. This is just how [it is] done. . . . [there is] no other way to think in medicine. One formulates a differential diagnosis in order to find out what is wrong and decide what to do about it.

> Q     Okay. As I understand it, . . . the doctor would make a list of the symptoms that the patient is reporting to the doctor. I think [that is] the first step. Then the second step is he then lists the possible causes for those. Does that sound right?

> A     Yes.

13

Q  And then the third step is you prioritize those causes, listing the worst possible causes as the most important, the first, the most important to check on. Is that correct?

A  That is correct.

Q  All right, and then the fourth after you have your priority list, you then try to rule out or treat the most dangerous cause that . . . could harm or kill the patient. Is that right?

A  Yes. So . . . it means you want to cross that off your list. . . . [Chest pain] is the worst thing until proven otherwise. So if you [cannot] rule [chest pain] out, then [you are] going to want to rule it in.

Dr. Klapper further testified that, based upon the internal medicine training he personally underwent, he would expect an internal medicine physician to know to do this.

When asked whether he believed Dr. Danna breached the standard of care, Dr. Klapper responded affirmatively, stating:

I believe it was a breach of the standard of care, because it substantially deviates from two things. One, the . . . guidelines that are out there for various societies, including the American College of Cardiology, that an acute coronary syndrome is handled in the hospital, and even in . . . the various updates of the definition of acute [myocardial infarction], . . . at least one of them, to the best of my recollection, says the standard of care with a suspected acute coronary syndrome, chest pain is to go to the emergency room. [That is] Number 1.

Number 2 is . . . how medicine is practiced in the United States, [what is] customary and usual and what has been done for many years, and that is patients who are having chest pain, or who have recently had chest pain, or one suspects an acute coronary syndrome, they go to the emergency room . . . .

Dr. Klapper testified that it constitutes a breach of the standard of care if a doctor does a differential diagnosis but does not rule out the most dangerous treatable condition. Dr. Klapper testified that in reviewing a deposition given by Dr. Danna in this matter, he noted that Dr. Danna listed acute coronary symptom and

dissection as potential causes for Mr. Gniady's chest pain; but Dr. Klapper also noted that Dr. Danna did not rule out myocardial infarction and the only way to do so would have been additional testing, including a troponin test, and sending Mr. Gniady to the emergency room. Additionally, Dr. Klapper testified that after Dr. Danna identified acute coronary symptom as "Number 1 on his differential diagnosis," the standard of care was for him to send Mr. Gniady to the emergency room.

*Dr. Danna*

Finally, Mr. Gniady called Dr. Danna as a witness. Dr. Danna identified himself as an internal medicine physician and testified that on October 5, 2015, he served as Mr. Gniady's primary care physician and had been Mr. Gniady's primary care physician since 2013. Dr. Danna stated that when he saw Mr. Gniady on October 6, 2015, he knew Mr. Gniady was sixty-two years old, had high blood pressure, smoked cigars, and had a family history of heart disease; and Dr. Danna further stated "that anyone with those types of risk factors has risk for coronary artery disease." Regarding the differential diagnosis process, Dr. Danna agreed that it can be defined as "a doctor who is diagnosing a patient's symptoms has a duty to rule out the most dangerous, treatable potential diseases first," and Dr. Danna testified that he performed a differential diagnosis on Mr. Gniady on October 6, 2015, listing acute coronary syndrome at the top of his list of potential causes of Mr. Gniady's chest pain. Dr. Danna explained that "[a]cute coronary syndrome consists of three potential diagnoses, including unstable angina, a non-ST-elevation [myocardial infarction], and a ST-elevation [myocardial infarction]." Regarding unstable angina, Dr. Danna agreed that it is "a medical emergency" and is defined

as "a recent onset of chest pain that is troublesome and frequent," as well as "cardiac in origin."

Discussing the differential diagnosis process, Dr. Danna explained that physicians use testing, as well as the patient's health history and physical, to rule out potential causes of the patient's complaint. Subsequently, Dr. Danna read aloud the history he recorded during Mr. Gniady's October 6, 2015 appointment:

> So when Mr. Gniady came to see me on October the 6[], 2015, he complained of central chest pain that started [within the past two weeks] when he resumed running. He said . . . he can run briskly without a problem but, when slowing down and walking, he develops a central chest pain that lasts a few minutes. [There is] radiation to bilateral arms, worse on the left, as well as to the neck. No associated nausea, vomiting, or diaphoresis, which is sweating. No unexpected shortness of breath. He does have hypertension, albeit well controlled, and smokes cigars. He had a similar event about 15 years ago and was found to have esophageal spasm. And he felt that this was similar to what he had felt 15 years ago. No radiation of the pain to the back.

Dr. Danna stated that Mr. Gniady did not report the October 4, 2015 chest pain incident to him. Thereafter, Dr. Danna read aloud the history given over the phone by Mr. Gniady on October 5, 2015, to Shalonda Raymond, L.P.N., whom Dr. Danna identified as his licensed practical nurse in October 2015:

> The patient called, complained of chest pain and back pain. Radiates to neck when exercising. Patient states he believes [it is] muscular pain. Patient states he started running two weeks ago. The pain began on Wednesday. Back pain is more noticeable today. Patient states he is working and does [not] want to . . . leave work if not necessary. Patient denies dizziness, nausea, or shortness of breath. Patient complains of left numbness/tingling, ongoing since rotator cuff surgery 20 years ago. Blood pressure ranging 110 to 120 — 110 to 120 to 145 over 70 to 90, depending on stress level and life events going on for the day. Taking meds as directed. Patient requesting a call from Dr. Danna and possibly have EKG but [does not] feel as if pain is caused from cardiac issues. [Does not] want to go to the emergency room.

Based on Mr. Gniady's history Dr. Danna stated that he "had some suspicion, based on risk factors, that [Mr. Gniady's complaints] could still be cardiac-related,

16

albeit not an emergent acute coronary syndrome," such that he "did not rule out any cardiac causes." However, Dr. Danna further testified that he "[did not] have any data to suggest that [Mr. Gniady] had unstable angina," and Dr. Danna stated that "[t]he way that Mr. Gniady described the pain was not consistent with angina, which has a very specific definition," and Mr. Gniady's description "was not a warning sign for an impending heart attack."

In particular, Dr. Danna explained why Mr. Gniady's description did not meet the definition of angina, stating:

> And I think [it is] appropriate for me to describe and explain what the definition of angina is. And so angina is cardiac-related chest pain. And the American College of Cardiology and the American Heart Association very clearly defines what angina is. It has to have three characteristics. So that first characteristic is the substernal chest discomfort, chest pain. And that substernal chest discomfort can have some associated symptoms such as nausea, vomiting, sweating, radiation to the neck, radiation to one or both arms. The second criteria for that is that pain has to be brought on by exertion. And the third criteria is that that pain has to be relieved with rest.
>
> So in Mr. Gniady's description of his pain, he did indeed have the substernal chest pain, but it was not brought on by exertion, but rather it started after he was exerting himself. And then, by definition, then he only had one . . . criteria [sic] of what is considered typical angina. And so according to the American Heart Association, if you have one or none of those criteria, [it is] considered noncardiac chest pain.
>
> . . . .
>
> [One must] account[] for the physiology associated with what creates angina. And angina, the way [it is] described and defined, is because of the difference in supply and demand mismatch that occurs. So when somebody runs, they require increased workload of the heart. That increased workload requires increased fuel, or oxygen, oxygen-rich blood going to heart. And so if [that is] not being supplied, then someone is going to experience chest pain. So someone [that is] able to run 4 miles without chest pain is not describing angina.

When asked whether Mr. Gniady was considered to be exerting himself when he experienced chest pain while walking after his runs so as to constitute "pain . . .

brought on by exertion" as found in his above definition of angina, Dr. Danna clarified that, to meet the definition of angina, Mr. Gniady would have had to have some portion of his chest pain while running too. That is, according to Dr. Danna, walking constitutes "a much lower level of exertion," so "if [an angina patient] is going to have chest pain at walking exertional levels, [the patient] most certainly would have had chest pain at running exertional levels," which Mr. Gniady did not report. Dr. Danna restated that Mr. Gniady did not inform him about the chest pain he experienced while walking up the ramp to his seat at the football game on October 4, 2015.[11] Importantly, Dr. Danna explained that "pain walking up the ramp, which is an increased level of exertion, obviously, walking up an incline, that would be potentially more consistent with typical angina," such that "[i]f [Mr. Gniady] had reported that . . . history . . . , it very much would have made [him] consider sending [Mr. Gniady] to the emergency room." In sum, Dr. Danna stated that, based on Mr. Gniady's reported history, description of the pain, and EKG, he determined as part of his differential diagnosis that Mr. Gniady's chest pain was not acute and was not angina.

Dr. Danna explained that because he did not believe Mr. Gniady had acute coronary syndrome based on Mr. Gniady's history and description of the pain, Dr. Danna decided to order an outpatient exercise treadmill cardiac stress test the next week rather than to send Mr. Gniady to the emergency room immediately. Further discussing the stress test, Dr. Danna contended that even if he had sent Mr. Gniady to the emergency room immediately, it would have been "very unlikely" for the

_____

[11] Again, we note that the parties debate whether Mr. Gniady reported the October 5, 2015 incident of chest pain to Dr. Danna. Mr. Gniady testified at the August 2022 trial that he did report the incident to Dr. Danna, but Dr. Danna testified that Mr. Gniady did not report it.

emergency room to conduct the stress test on Mr. Gniady that same day. Dr. Danna also noted that while the EKG performed on October 6, 2015, "did show abnormalities," it "did not show any warning signs for problems with acute coronary syndrome." Dr. Danna also testified that, on October 6, 2015, he "considered referring to cardiology, but [he did not] have all the data to refer [Mr. Gniady] yet." In sum, Dr. Danna testified that while he "did not rule out that the chest pain that [Mr. Gniady] had was cardiac-related," he did determine that Mr. Gniady's episodes of chest pain "were not characteristic of acute coronary syndrome." When asked whether the differential diagnosis process also calls for treating the patient, Dr. Danna responded, "There was no indication for any medical treatment at that time."

***Ochsner's Case-in-Chief***

*Dr. Wilkow*

As part of its case-in-chief, Ochsner first called Dr. Wilkow as a witness, who stated that he was board-certified in cardiology and interventional cardiology[12] and served as the chief medical officer of Touro's employed physicians and as director of Touro's cardiac catheterization laboratory. Dr. Wilkow stated that approximately ninety to ninety-five percent of his work time is spent in the hands-on clinical care of patients. The trial court accepted Dr. Wilkow as an expert in interventional cardiology.

---

[12] When asked the difference between general cardiology and interventional cardiology, Dr. Wilkow responded, "[I]nterventional cardiologists put in stents, pacemakers, structural heart disease. So [interventional cardiologists] actually perform procedures on patients, where general cardiologists — typically, they . . . diagnose or refer."

Dr. Wilkow testified that he believed Dr. Danna met the standard of care in his treatment of Mr. Gniady. Discussing Dr. Danna's decision to send Mr. Gniady for a stress test the following week based on his cardiac risk factors, Dr. Wilkow agreed that this was "reasonable and appropriate under the circumstances" and met the standard of care. Dr. Wilkow even testified, "[It is] what I would do in clinic," emphasizing the importance of a patient's history and physical.[13] He stated that Dr. Danna's actions in light of Mr. Gniady's history and physical constituted "the appropriate workup." In discussing a note in Mr. Gniady's records from the October 6, 2015 appointment that Dr. Danna "discussed with the patient the emergency room protocol and to go to the emergency room if he has any further problems," Dr. Wilkow agreed that this was "reasonable and appropriate and in accordance with acceptable standards of care." Further, Dr. Wilkow stated that he disagreed that the standard of care required Dr. Danna to immediately send Mr. Gniady to the emergency room on October 6, 2015. Dr. Wilkow explained that he arrived at these conclusions because Mr. Gniady's descriptions of his chest pain were not consistent with angina. Like Dr. Danna, Dr. Wilkow testified that "angina has a specific definition," and he defined it as "chest pain with exertion or emotion, better with rest or nitroglycerin." Dr. Wilkow elaborated that "associated with exertion," means "exertion makes it worse, . . . so the definition is 'worse with exertion, better with rest.'" In this regard, Dr. Wilkow opined about Mr. Gniady's reported chest pain complaints that, "it [does not] make sense that [one] can run 4 miles without chest pain, and then get chest pain when . . . resting. [The chest pain] should get better with rest and" one should "not be able to exert [one]self if"

---

[13] On re-direct, Dr. Wilkow reiterated this point, stating that "the history is more important and more accurate than any stress test or EKG."

experiencing "a significant issue." Essentially, Dr. Wilkow explained, a patient who had typical angina physiologically would not be able to run four miles without any chest pain.

Dr. Wilkow attested to his familiarity with the "2012 ACCP/AHA/ACP/AATS Guidelines for the Diagnosis and Management of Patients with stable Ischemic Heart Disease" ("2012 Guidelines") and affirmed that the 2012 Guidelines were in place at the time Mr. Gniady visited Dr. Danna on October 6, 2015. Dr. Wilkow read aloud from the guidelines that "[t]ypical angina is 'substernal chest discomfort with a characteristic quality and duration that is provoked by exertion or emotional stress and relieved by rest or nitroglycerin.'" Considering Mr. Gniady's description of his chest pain, Dr. Wilkow stated that it only met one of the three characteristics in this definition: Mr. Gniady had substernal chest pain, but it was not provoked by exertion or emotional stress and was not relieved by rest or nitroglycerin.[14] Dr. Wilkow further explained that if a patient's complaint meets one or none of the characteristics, then it is considered non-cardiac chest pain, and if it meets two of the characteristics, then it is deemed atypical chest pain. Thus, Dr. Wilkow stated that he disagreed with Dr. Klapper's testimony that Mr. Gniady's complaint met the definition of angina.

Dr. Wilkow agreed that Mr. Gniady's EKG showed abnormalities;[15] however, when asked whether there was "anything in th[e] EKG that . . . [would have] raised . . . the index of suspicion for Dr. Danna that he [should have] sent

---

[14] Dr. Wilkow acknowledged that the October 4, 2015 incident of chest pain when Mr. Gniady was walking up the ramp constituted an example of exertional chest pain, but Dr. Wilkow pointed out that it is not in the report from Mr. Gniady's October 6, 2015 appointment with Dr. Danna.

[15] Later, on cross-examination, Dr. Wilkow testified that "[t]he majority of the EKGs [he performs] in clinic are abnormal."

Mr. Gniady to the emergency room," Dr. Wilkow responded, "No, sir." Dr. Wilkow further explained that "[t]he kind of heart attack [Mr. Gniady] had . . . [is] a sudden event." To this extent, Dr. Wilkow opined that even if Dr. Danna had sent Mr. Gniady to the emergency room and the emergency room performed an EKG, that EKG would have looked the same as the one performed at Dr. Danna's office, i.e., abnormal but not indicating an acute or angina situation. Further, Dr. Wilkow believed that even if Mr. Gniady went straight to the emergency room, the emergency room likely would not have done a troponin draw because they "only draw troponin on somebody [that is] having chest pain," which Mr. Gniady was not reporting at that time. Dr. Wilkow stated that even if the emergency room had performed a troponin test, it would have been normal because Mr. Gniady's heart attack was sudden later that day at approximately 11:00 p.m. and only then did Mr. Gniady's troponin level become elevated.[16] Dr. Wilkow also opined that a patient

---

[16] When Dr. Wilkow expounded upon his opinion that Mr. Gniady's troponin level would have been normal earlier in the day on October 6, 2015, the following colloquy occurred:

> A.      [Mr.Gniady's] troponin was 0.069 [at approximately 1:14 a.m. on October 7, 2015]. It takes about 90 minutes for troponin to peak. So the half-life of troponin is about 90 minutes. So it tells me that whatever happened just started happening, because it is very mildly elevated, [it is] not very high.

> Q.      Would that troponin level drawn at 1:14 a.m. [on October 7, 2015,] be consistent with what you told the jury earlier, which is a sudden, very recent rupture of plaque?

> A.      Yes. So, you know, we know that it was at least a half an hour that he was having chest pain. . . .

>      . . . .

> His repeat troponin at seven o'clock in the morning [on October 7, 2015,] was greater than 50, which is . . . seven times higher. So [that is] in seven hours. So it . . . suggests that what happened started

like Mr. Gniady in the emergency room, who was not complaining of chest pain and would have exhibited a normal troponin level, would not have received anticoagulation medicine, which poses risks, and would not have received orders to go to the cardiac "cath lab" because "[it is] an invasive procedure with significant risk."[17] When asked whether the outcome would have been different if Dr. Danna had sent Mr. Gniady directly to the emergency room, Dr. Wilkow responded:

> So if he was in the hospital, he might have had a heart attack in the hospital. Dr. Bhansali, the cath lab crew — they [were not] there in the hospital. They [would have] had to come in. [Mr. Gniady] made it to the hospital before Dr. Bhansali. So it probably would have been very similar, same amount of time that it takes.

> Have I had patients have a heart attack in the hospital? Yes. You come in the hospital, take them to the cath lab. I [do not] think that would have changed the timing or delay. In fact, it may have . . . delayed it more. The emergency room is used to doing things quickly and setting up people for a heart attack, so I [do not] believe there would have been a different outcome, if that answers your question.

Additionally, in Dr. Wilkow's opinion, Mr. Gniady's complaints of chest pain on September 30, October 1, and October 4, 2015, "were not related" to Mr. Gniady's heart attack on October 6, 2015. Dr. Wilkow further stated that, even if Mr. Gniady did report the October 4, 2015 chest pain to Dr. Danna, which the

---

happening just, you know, 10 or 15 minutes before he came to the hospital.

Dr. Wilkow explained that normal troponin level is 0.026.

[17] Dr. Wilkow reiterated this point during cross-examination, stating:

I [do not] bring people to the cath lab if [they are] not having chest pain. Like I said, [it is] an invasive procedure with considerable risks. If I took somebody that [was not] having chest pain to the cath lab and they had a complication, . . . [they would] be suing me for causing a complication, if [it is] not indicated, we follow the standard of care [that is] made from guidelines and years of research.

parties debated, Dr. Wilkow still believed that Dr. Danna did not breach the standard of care.

*Dr. Lege*

Next, Ochsner called Dr. Lege, who stated that he specialized in internal medicine and had training in pediatrics. Dr. Lege explained that he had been in private practice at Touro infirmary since 2004 and presently served as the chief medical officer at Touro Infirmary but that ninety percent of his time was dedicated to clinical duties in 2015. The trial court accepted Dr. Lege as an expert in the field of internal medicine.

At the outset, Dr. Lege discussed his role as a member of the medical review panel that convened on October 2, 2017, to review Mr. Gniady's case.[18] Dr. Lege explained that both he and Dr. Stephanie Sarrat ("Dr. Sarrat"), whom he identified as a local internist, concluded that Dr. Danna had not committed malpractice, whereupon the following colloquy occurred:

> A. So our reasoning number one was that "[t]he patient was triaged appropriately for his presenting complaint with an urgent office visit. The patient was appropriately advised to go to the emergency room."
>
> . . . .
>
> A. So per the review of the records, when the patient contacted the office the day before his visit, he was instructed, related to his concerns about his chest pain, to present to the emergency room that day. In lieu of presenting to the emergency room, he was given an appointment the next morning. And so that was the basis for that statement.
>
> Q. Okay. And in your opinion and Dr. Sarrat's, that was reasonable and appropriate and met the standard of care?
>
> A. Yes.

---

[18] The trial court admitted the medical review panel's opinion as an exhibit at the trial.

. . . .

A.    And then, number two, "The office visit was properly documented and the objective findings in that office visit led to a recommendation for a stress test."

Q.    All right. So [let us] look real quick at Joint Exhibit 82 and 83, which are the notes from Dr. Danna's office on October 6, 2015.

[You have] seen these; correct?

A.    Correct.

Q.    In your opinion, Dr. Lege, was the documentation by Dr. Danna reasonable, appropriate, and in accordance with the standard of care?

A.    Yes, all three.

Q.    And you said "the objective findings at that office visit led to a recommendation for a stress test"?

A.    Correct.

Q.    Elaborate on that, please.

A.    So in reviewing the records of the visit, including the presenting complaint and the evaluation that was done in the office that day, the recommendation to the patient to have a stress test done to further evaluate his complaint of chest pain in the previous near term was, we felt, appropriate and did meet standard of care.

Thereafter, Dr. Lege acknowledged that the third member of the review panel, Dr. Songy, concluded that Ochsner and Dr. Danna breached the standard of care, listing his reason as "[t]he patient presented with symptoms and an abnormal EKG that should have prompted immediate referral." Dr. Lege stated that he disagreed with Dr. Songy's conclusion that immediate referral was necessary. Further, Dr. Lege testified that even after reading the depositions of Mr. Gniady, Mr. Gniady's wife, Mr. Gniady's daughter, and the other physicians, he remained "of the opinion that the standard of care was met in this case" and stated that he "would have managed this patient exactly the same." He disagreed that the standard of care

required Dr. Danna to send Mr. Gniady to the emergency room immediately and instead agreed with Dr. Danna's decision to set up a stress test.

Regarding the differential diagnosis process, Dr. Lege stated that physicians "always formulate a differential diagnosis when . . . evaluating a patient" and agreed that "[it is] very important." He explained that the differential diagnosis was not a static process:

> Well, we formulate differential diagnoses based on multiple factors. And as [we are] evaluating the patient, we are getting more information constantly. That includes the history from the patient, vital signs, and examination findings, and then testing that we do a lot of times in stages. And as we go through stages of that testing, then the differential diagnosis may change as things are ruled out or things may be ruled in based on that, so it is not a static diagnosis.

He noted that a differential diagnosis for someone reporting chest pain like Mr. Gniady did would include cardiac chest pain, conditions related to the lungs, and conditions related to the esophagus. Dr. Lege repeated that the definition of angina is "substernal chest pain with exertion that is relieved by rest or nitroglycerin" but stated that Mr. Gniady's description of his chest pain was "not typical angina." Further expounding upon the differential diagnosis process, Dr. Lege stated:

> Our job is to determine whether Mr. Gniady, or a patient, is having acute coronary syndrome, which is active issues at the point of care, at the time that [we are] evaluating them. And nothing in the visit and presentation that day met any of those criteria. And so we can always send patients to emergency rooms. But, in fact, the evaluation there would have been very similar and likely the outcome, meaning the patient being sent home to do a stress test, would have been the same.

Discussing the discrepancy as to whether Mr. Gniady reported the October 4, 2015 incident of chest pain when he called on October 5, 2015, and when he saw Dr. Danna on October 6, 2015, Dr. Lege stated that even if Mr. Gniady did report it, Dr. Lege still believed that Dr. Danna met the standard of care. He explained

that he arrived at this conclusion because "the findings at [the October 6, 2015] visit of no chest pain at the time, the objective data of the physical exam, and the EKG still [did not] point to anything happening acutely. And so . . . I would have still made that decision" to refer Mr. Gniady for outpatient testing.[19]

Dr. Lege theorized that, if Mr. Gniady had been sent to the emergency room immediately, the emergency room would have performed a repeat EKG and performed a troponin draw "just because of the chest pain history." However, Dr. Lege testified that Mr. Gniady's troponin level at that time "very likely" and "more likely than not" would have been normal. Accordingly, Dr. Lege stated that "[t]here would have been no indication for" administering blood thinner medications to Mr. Gniady.

On cross-examination, Dr. Lege repeated his opinion that Mr. Gniady's chest pain complaints did not meet the definition of angina, explaining that Mr. Gniady's chest pain occurred while Mr. Gniady was walking which did not constitute "exertion or emotional . . . stress." In terms of the differential diagnosis, Dr. Lege did agree that acute coronary syndrome could have been one of the most dangerous potential conditions and causes for Mr. Gniady's chest pain. Dr. Lege agreed that Dr. Danna did not rule out unstable angina during the October 6, 2015 appointment because Dr. Danna was not sure at that point if Mr. Gniady's chest pain was even cardiac-related; but Dr. Lege stated that Dr. Danna did not breach the standard of care in failing to rule out unstable angina during that visit and in sending Mr. Gniady home that day. On redirect, Dr. Lege also stated that he did

_____

[19] Dr. Lege did add the caveat that knowledge of the October 4, 2015 chest pain incident would have rendered him inclined to set up the stress test sooner (within forty-eight hours) "[b]ecause [his] level of suspicion that this could be cardiac pain [would have] been higher."

not believe the standard of care in this case required Dr. Danna to call a cardiologist on October 6, 2015, and he did not think the outcome would have been different if Mr. Gniady had gone straight to the emergency room.

*Dr. Danna*

During its case-in-chief, Ochsner recalled Dr. Danna to the witness stand. In pertinent part, Dr. Danna again testified that if Mr. Gniady had told him about the October 4, 2015 incident of chest pain, "it certainly would have been in the record." Nonetheless, Dr. Danna stated that it did not "sound like Mr. Gniady was having pain on that description at exertion," such that even knowing about that incident would not have led Dr. Danna to send Mr. Gniady to the emergency room on October 6, 2015, though it might have made him more inclined to order that the stress test occurred "in the next two or three days." He agreed with the opinions of Dr. Wilkow and Dr. Lege that even if he had sent Mr. Gniady to the emergency room, the outcome would have been the same. Regarding the differential diagnosis, Dr. Danna reiterated that "[t]he way that [Mr. Gniady] described [his chest pain] to me that day on October 6th was not consistent with angina. But, again, his risk factors raised enough of a flag to say we need to do more." In sum, Dr. Danna testified that he believed his "recommendation for a stress test, based on [Mr. Gniady's] presentation, met the standard of care." On cross-examination, when asked whether he ruled out acute coronary syndrome during his differential diagnosis, Dr. Danna responded, "[B]ased on my history, [Mr. Gniady] did not have angina. And because he [did not] have angina, he did not have acute coronary syndrome." On redirect, Dr. Danna clarified that he was able to rule out unstable angina based on Mr. Gniady's presentation, history, EKG, and physical examination. Dr. Danna explained that he ruled out acute coronary syndrome but

28

ordered the stress test to investigate whether the chest pain was cardiac or heart-related.

**Jury Verdict and August 29, 2022 Judgment**

After closing arguments on August 19, 2022, the jury retired to deliberate; and when the jury returned with the verdict, the trial court read the jury's verdict:

THE COURT:

. . . .

The jury verdict is as follows:

"Question No. 1: Do you find by a preponderance of the evidence that Dr. Samuel Colby Danna, an employee of Ochsner Clinic Foundation, breached the applicable standard of care in connection with his treatment of David Gniady?"

The answer on the form is "No."

Is that the correct verdict?

JUROR NO. 2:

Yes, Your Honor.

Thereafter, counsel for Ochsner moved to make the jury's verdict the judgment of the court, and the trial court ordered that the jury's verdict be adopted as the court's judgment.

Subsequently, the trial court signed a judgment in accordance with the jury's verdict. The judgment stated, in pertinent part:

In accordance with the verdict of the jury,

**IT IS ORDERED, ADJUDGED, AND DECREED** that final judgment be rendered in favor of the Defendant, Ochsner Clinic Foundation, and against Plaintiff, David Gniady. Plaintiff's claims [against] Defendant be, and same are hereby, dismissed with prejudice, with each party to bear their own costs.

The trial court signed the above judgment on August 29, 2022.

***Motion for JNOV/New Trial***

On September 26, 2022, Mr. Gniady filed his Motion for JNOV/New Trial. In part, Mr. Gniady asserted that this constituted an instance of "obvious medical negligence" in that "the common knowledge of lay persons is sufficient to infer negligence from the facts and" that "Ochsner should have been held negligent." Mr. Gniady contended that he had proven that Dr. Danna breached the "differential diagnosis" standard of care because "Dr. Danna sent Mr. Gniady home without ruling out the most dangerous cause of [Mr. Gniady's] chest pain before it could harm him." Accordingly, he argued that "the jury should have concluded that [Dr. Danna] failed to attend [to Mr. Gniady] knowing those chest pains could be a precursor of an upcoming heart attack." Mr. Gniady contended that "the jury verdict [wa]s a miscarriage of justice" and "clearly contrary to [the] law and evidence."

The trial court held a hearing on Mr. Gniady's Motion for JNOV/New Trial on November 18, 2023. In orally ruling on Mr. Gniady's Motion for JNOV/New Trial, the trial court stated:

> As was said, we all know that the standard for granting a motion for judgment notwithstanding the verdict is very rigorous. When applying that standard to the facts and circumstances of this case, [Mr. Gniady]'s motion for JNOV has to be denied. Stated plainly, the JNOV here could only be granted if the evidence adduced at trial was so strongly in favor of [Mr. Gniady] that reasonable and fair-minded persons in the exercise of impartial judgment could not have reached different conclusions. But that is not what we had in this case.
>
> Based on everything that made its way into the record and what the jury got a chance to see, hear, and consider, the members of the jury could have easily disagreed as to whether or not Dr. Danna's differential diagnosis was improper or whether he breached the standard of care in his treatment of Mr. Gniady. Specifically, Dr. Lege and Dr. Danna testified as to the standard of care required by an internist and that Dr. Danna met the standard of care in his treatment. Dr. Wilkow also testified as to the cause of [Mr. Gniady]'s heart

attack and that it was undetectable at the time of Dr. Danna's treatment of the plaintiff. He also testified that [Mr. Gniady]'s theory of causation was not supported by the medical evidence.

For these reasons, the strict JNOV standard is not satisfied here. Accordingly, [the] motion for JNOV is hereby denied.

With respect to the motion for new trial, it is well established in Louisiana jurisprudence that the trial court has great discretion in determining whether to grant a motion for new trial, which must be exercised with considerable caution because a successful litigant is entitled to the benefits of a favorable jury verdict.

Plaintiff argues that a new trial must be granted under the peremptory ground of Article 1972 because the jury's verdict is allegedly clearly contrary to the law and evidence for the same reasons stated in the motion for JNOV. The Court disagrees. As previously stated, Dr. Danna and Dr. Lege testified as to the standard of care of an internist and that Dr. Danna's actions were not a breach of the standard. Dr. Wilkow testified that Dr. Danna's actions were not the cause of Mr. Gniady suffering a heart attack. Based on this, the Court cannot say that the jury's verdict was clearly contrary to the law and evidence.

Furthermore, the court finds that this is not a case of obvious medical negligence such that expert testimony was not necessary nor is that argument particularly relevant to this case as both parties presented multiple expert witnesses to testify as to the standard of care and causation.

Having considered the arguments of counsel and the briefs submitted in support thereof and for the reasons orally assigned, it is ordered that [Mr. Gniady]'s motion for a new trial is hereby denied. [That is] the Court's ruling.

On November 23, 2022, the trial court signed a judgment denying Mr. Gniady's Motion for JNOV/New Trial. Thereafter, on January 12, 2023, Mr. Gniady filed a Motion for Appeal.

**PRELIMINARY MATTER – TIMELINESS OF APPEAL**

Before discussing the merits of the issues involved in this appeal, we note a preliminary matter that bears explanation: in our initial review of the record, we observed that Mr. Gniady's appeal appeared untimely. In the record before this

31

Court, the only date on the "Notice of Signing of Judgment" ("Notice") for the August 29, 2022 judgment was August 29, 2022. If the trial court had in fact issued the Notice on August 29, 2022, this would indicate that Mr. Gniady's September 26, 2022 Motion for JNOV/New Trial was untimely. *See* La. C.C.P. arts. 1974 and 1811 (providing that a party has seven days after the clerk has mailed or the sheriff has served notice of the judgment within which to apply for a new trial or a judgment notwithstanding the verdict). Mr. Gniady's January 12, 2023 Motion for Appeal would also be considered untimely under this timeline. *See* La. C.C.P. art. 2087 (providing that a party must bring a motion for devolutive appeal within sixty days of the expiration of the delay for applying for a new trial or judgment notwithstanding the verdict or within sixty days of notice of the court's refusal to grant a timely filed application for same); *see also Williams v. Pel Hughes Printing Co.*, 2018-0613, p. 3 (La. App. 4 Cir. 10/24/18), 257 So.3d 1264, 1266 (holding that the appeal delays do not stop running if a party untimely filed a motion for new trial) (quoting *Tennebaum v. LeCompte*, 2015-0008, p. 2 (La. App. 4 Cir. 8/12/15), 173 So.3d 1185, 1185).

However, on June 19, 2023, Mr. Gniady filed with this Court a "Motion . . . to Supplement the Record," ("Motion to Supplement") wherein he contended that the trial court did not actually mail the Notice of the August 29, 2022 judgment until September 21, 2022. In his Motion to Supplement, Mr. Gniady contended that the trial court judge's law clerk, whose initials are "MC," handwrote on the Notice that the trial court mailed the August 29, 2022 judgment on September 21, 2022. Mr. Gniady attached to his Motion to Supplement a copy of the Notice, which bore a handwritten notation that stated "Mailed 9/21/22 MC." Mr. Gniady moved this Court to supplement the record with that copy of the Notice to demonstrate that his

Motion for JNOV/New Trial and Motion for Appeal were timely because Mr. Gniady timely filed these pleadings based on having received the Notice of the August 29, 2022 judgment after the trial court mailed it on September 21, 2022. In response to Mr. Gniady's Motion to Supplement, this Court issued an Order on June 20, 2023, granting Mr. Gniady's Motion and ordering the Clerk of Court for Orleans Parish Civil District Court to supplement the record with a copy of the Notice that reflected the notation that the August 29, 2022 judgment was mailed on September 21, 2022. On June 26, 2023, we received a letter from the Chief Deputy Clerk for the Orleans Parish Civil District Court informing us that she was unable to locate an "August 29, 2022 Notice of Signing of Judgment that reflects the notation that the judgment was mailed on September 21, 2022."

In considering the timeliness of Mr. Gniady's appeal, we note that in its July 31, 2023 brief to this Court, Ochsner stated that "[o]n September 21, 2022, the Clerk of Court for the Civil District Court for the Parish of Orleans issued a Notice of Signing of Judgment in compliance with Article 1913 of the Louisiana Code of Civil Procedure, to which the Final Judgment of the Court, signed on August 29, 2022, was attached." Thus, Ochsner also contends that the trial court did not send the Notice regarding the August 29, 2022 judgment until September 21, 2022. Moreover, this Court has held that "[a]ppeals are favored and 'in the absence of the clerk's certificate showing the date of the mailing of the judgment and to whom it was mailed, doubt should be resolved in favor of the right to appeal.'" *State in Interest of J.V.I.*, 2023-0557, pp. 5-6 (La. App. 4 Cir. 11/13/23), ___ So.3d ___, ___, 2023 WL 8094220, at *3 (quoting *State v. Fin. Cas. & Sur.*, 2017-1014, p. 7 (La. App. 4 Cir. 11/7/18), 318 So.3d 713, 717) (citing *State in the Interest of K.B.*, 2023-0409, pp. 15-16, 372 So.3d at 876-77). It is a "fundamental principle that an

33

appeal should not be dismissed unless the reason for doing so is free from doubt." *Id.* at p. 5, ___ So.3d at ___, 2023 WL 8094220, at *3 (citing *Fraternal Order of Police v. City of New Orleans*, 2002-1801, p. 2 (La. 11/8/02), 831 So.2d 897, 899). In light of the foregoing jurisprudence and the contentions from Mr. Gniady and Ochsner that the trial court did not mail the Notice of the August 29, 2022 judgment until September 21, 2022, we will consider Mr. Gniady's Motion for JNOV/New Trial and Motion for Appeal to be timely.

### ASSIGNMENTS OF ERROR

We note that Mr. Gniady failed to list any assignments of error in his brief to this Court. However, La. C.C.P. art. 2129 states that "[a]n assignment of errors is not necessary in any appeal." Further, La. C.C.P. art. 2164 provides that "[t]he appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." Based on these authorities, the Louisiana Supreme Court has "held that an appellate court has the authority to consider an issue even when there is no assignment of error." *Merrill v. Greyhound Lines*, 2010-2827, p. 2 (La. 4/29/11), 60 So.3d 600, 601 (citing *Nicholas v. Allstate Ins. Co.*, 1999-2522, pp. 7-8 (La. 8/31/00), 765 So.2d 1017, 1022-23; *Georgia Gulf Corp. v. Bd. of Ethics for Pub. Emps.*, 1996-1907, pp. 5-6 (La. 5/9/97), 694 So.2d 173, 176). Thus, we will consider the issues raised in Mr. Gniady's brief.

In particular, in a section of his brief titled "Restatement of the Issues," Mr. Gniady contends that he "proved that . . . Ochsner . . . and . . . [Dr.] Danna breached the longstanding Standard of Care called Differential Diagnosis when Dr. Danna failed to rule out a cardiac cause for [Mr.] Gniady's recent chest pain which could be a life-threatening condition, on his office visit of October 6, 2015." In another section titled "Damages," Mr. Gniady states that Dr. Bhansali "testified

34

that [Mr.] Gniady lost 50% of his heart because of the heart attack" and that if Mr. Gniady had undergone "cardiac catherization [sic] earlier, he would not have sustained the horrific heart attack that he sustained." We also note that Mr. Gniady alleges in his brief that this case presents a scenario in which expert testimony was unnecessary to establish a breach of the standard of care. Before addressing the issues discussed by Mr. Gniady in his brief, i.e., whether experts were necessary and whether Mr. Gniady proved a breach of the standard of care and resulting damages, we turn to the applicable standards of review.

## STANDARDS OF REVIEW

As we previously stated, Mr. Gniady seeks review of the trial court's November 23, 2022 judgment, which denied his Motion for JNOV/New Trial regarding his underlying medical malpractice claim. Because Mr. Gniady's Motion for JNOV/New Trial was based on the jury's verdict that Mr. Gniady did not prove his medical malpractice claim, we must discuss the standards of review applicable to motions for judgment notwithstanding the verdict, motions for new trial, and medical malpractice actions.

### *Motion for Judgment Notwithstanding the Verdict*

According to La. C.C.P. art. 1811(F), a "motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues." In *Davis v. Wal-Mart Stores, Inc.*, the Louisiana Supreme Court explained that appellate review of a trial court's ruling on a motion for judgment notwithstanding the verdict entails a two-part test. 2000-0445, p. 5 (La. 11/28/00), 774 So.2d 84, 89. First, the appellate court applies the same criteria that the trial court did in deciding whether or not to grant the motion. *Id.* In particular, a motion for judgment notwithstanding the verdict should be granted

"when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict." *Id.* at p. 4, 774 So.2d at 89 (citations omitted). However, "[t]he motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable [people] could not reach different conclusions, not merely when there is a preponderance of evidence for the mover." *Id.* If "reasonable and fair-minded [people] in the exercise of impartial judgment might reach different conclusions," then the trial court should deny the motion. *Id.* In determining whether to grant a motion for judgment notwithstanding the verdict, "the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party." *Id.*

Second, if the appellate court determines that that the trial court correctly applied these criteria to the jury verdict, then the appellate court reviews the trial court's decision for manifest error. *Id.* at p. 5, 774 So.2d at 89 (citing *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829, 832 (La. 1991)). Thus, in reviewing a trial court's grant or denial of a motion for judgment notwithstanding the verdict, an appellate court applies the manifest error standard of review. *Darbone v. State*, 2001-1196, p. 12 (La. App. 3 Cir. 2/6/02), 815 So.2d 943, 952 (citing *Davis*, 2000-0445, p. 5, 774 So.2d at 89).

***Motion for New Trial***

Regarding a trial court's judgment on a motion for new trial, this Court has previously explained:

> The standard of review for a motion for new trial is "whether the trial court abused its discretion." *Campbell v. Tork, Inc.*, [2003-1341, p. 4 (La. 2/20/04),] 870 So.2d 968, 971. In making this

determination, an appellate court must balance the deference due to the jury in its role as a fact finder and the discretion given to the trial court in its decision on whether to grant a new trial. *Id.* Generally, a trial judge "may not interfere with a jury verdict with which he simply disagrees when that verdict is based on a fair interpretation of the evidence." *Id.* [2003-1341, p. 11, 870 So.2d] at 975.

*In re Boryca*, 2020-0670, 0671, 0672, 0673, p. 9 (La. App. 4 Cir. 8/11/21), 366 So.3d 110, 117-18.

We note that "[t]he standard of review for a motion for new trial is 'less stringent' than the standard of review for a motion for [judgment notwithstanding the verdict] . . . ." *Hero Lands Co., L.L.C. v. Chevron U.S.A. Inc.*, 2022-0224, p. 42 (La. App. 4 Cir. 3/7/23), 359 So.3d 130, 156 (quoting *Davis*, 2000-0445, p. 10, 774 So.2d at 93). This is because a motion for new trial merely "involves . . . a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury." *Darbone*, 2001-1196, p. 4, 815 So.2d at 947 (quoting *Broussard v. Stack*, 1995-2508, pp. 14-16 (La. App. 1 Cir. 9/27/96), 680 So.2d 771, 779-81). *See also Templet v. State ex rel. Dep't of Transp. & Dev.*, 2000-2162, p. 5 (La. App. 1 Cir. 11/9/01), 818 So.2d 54, 57-58 (explaining that because a motion for judgment notwithstanding the verdict "deprives the parties of their right to have all disputed issues resolved by a jury," its resolution "requires a stringent test . . . .") (citing *Martin v. Heritage Manor S. Nursing Home*, 2000-1023, p. 4 (La. 4/3/01), 784 So.2d 627, 631).

Thus, we must determine whether the trial court manifestly erred in denying the judgment notwithstanding the verdict portion of Mr. Gniady's Motion for JNOV/New Trial and whether the trial court abused its discretion in denying the new trial portion of Mr. Gniady's Motion for JNOV/New Trial. To do so, we must also consider the standard of review applicable to medical practice appeals.

*Medical Malpractice Actions*

As discussed more fully throughout this Opinion, the plaintiff bears the burden of proof in a medical malpractice action. Each of the elements that the plaintiff must prove to succeed in a medical malpractice action constitutes a question of fact, which is "subject to . . . the manifest error/clearly wrong standard of review." *McCarter v. Lawton*, 2009-1508, pp. 3-4 (La. App. 4 Cir. 7/21/10), 44 So.3d 342, 346 (quoting *Barre v. Nadell*, 1994-1883, 1884, p. 7 (La. App. 4 Cir. 6/7/95), 657 So.2d 514, 519) Thus, the standard of review in a medical practice action is manifest error or clearly wrong. *In re Boryca*, 2020-0670, 0671, 0672, 0673, p. 5, 366 So.3d at 115 (citing *Johnson v. Ray*, 2012-0006, 0007, p. 6 (La. App. 4 Cir. 12/5/12), 106 So.3d 629, 635). "[T]o reverse a fact-finder's determination, an appellate court must review the record in its entirety and make the following two determinations: (i) that a reasonable factual basis does not exist for the finding, and (ii) that the record establishes that the fact-finder is clearly wrong or manifestly erroneous." *Serpas v. Tulane U. Hosp. & Clinic*, 2013-1590, 1591, pp. 12-13 (La. App. 4 Cir. 5/14/14), 161 So. 3d 726, 736 (citing *Salvant v. State*, 2005-2126, p. 5 (La. 7/6/06), 935 So.2d 646, 650). This is the same standard of review applicable in ordinary negligence actions. *Johnson*, 2012-0006, 0007, p. 6, 106 So.3d at 635. Under this standard of review, an "appellate court may not set aside the factual findings made by the trier of fact in the absence of manifest error." *Sumter v. W. Jefferson Med. Ctr.*, 2002-1103, p. 4 (La. App. 5 Cir. 4/29/03), 845 So.2d 1179, 1181 (citing *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 1993-3099, 3110, 3112, p. 7 (La. 7/5/94), 639 So.2d 216, 220). This is true "regardless of whether [the] appellate court agrees with those findings." *In re Boryca*, 2020-0670, 0671, 0672, 0673, p. 5, 366 So.3d at 115-16 (citing *Johnson*,

2012-0006, 0007, p. 6, 106 So.3d at 635). This is "because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Benefield v. Sibley*, 43,317, p. 6 (La. App. 2 Cir. 7/9/08), 988 So.2d 279, 286 (first citing *Wiley v. Lipka*, 42,794, p. 16 (La. App. 2 Cir. 2/6/08), 975 So.2d 726, 735; and then citing *Harper v. Smith*, 42,586, p. 7 (La. App. 2 Cir. 10/24/07), 968 So.2d 321, 325). Instead, the appellate court's duty is to determine whether "the fact-finder's conclusion was a reasonable one[;]" but if "there are two permissible views of the evidence, the fact-finder's choice cannot be manifestly erroneous or clearly wrong." *Serpas*, 2013-1590, 1591, p. 13, 161 So.3d at 736 (citations omitted).

As this Court has previously explained, in a medical malpractice action, "the factfinder (whether judge or jury), is typically largely dependent upon the testimony of expert witnesses to establish the specialized standard of care." *McCarter*, 2009-1508, p. 4, 44 So.3d at 347 (first citing La. C.E. art. 702; next citing *Pfiffner v. Correa*, 1994-0992, 0963, 0992, p. 8 (La.10/17/94), 643 So.2d 1228, 1233; next citing *Samaha v. Rau*, 2007-1726, pp. 5-6 (La. 2/26/08), 977 So.2d 880, 884; and then citing *Djorghi v. Glass*, 2009-461, pp. 4-5 (La. App. 3 Cir. 11/4/09), 23 So.3d 996, 999). Expert testimony assists the trier of fact in understanding the standard of care and determining whether there has been a breach of the standard of care. *Id.* (quoting *Serigne v. Ivker*, 2000-0758, pp. 5-6 (La. App. 4 Cir. 1/23/02), 808 So.2d 783, 787-88). The factfinder's credibility determinations regarding expert testimony are factual questions to which an appellate court applies the manifest error/clearly wrong standard of review. *Id.* (quoting *Martin v. E. Jefferson Gen. Hosp.*, 582 So.2d 1272, 1277 (La.1991)). Oftentimes, "[e]xpert witnesses . . . disagree as to the standard of care applicable to

a case," and if "such a disagreement occurs, the [factfinder]'s determination is given a great deal of deference." *McCarter*, 2009-1508, p. 4, 44 So.3d at 347 (quoting *Serigne*, 2000-0758, pp. 5-6, 808 So.2d at 787-88). Additionally, "[i]t is axiomatic that when there is conflicting expert testimony concerning the defendant's compliance with the standard of care, the reviewing court must give great deference to the fact-finder's conclusion." *In re Boryca*, 2020-0670, 0671, 0672, 0673, p. 8, 366 So.3d at 117 (citing *Serpas*, 2013-1590, 1591, p. 13, 161 So.3d at 736-37). Thus, "[w]hen a factfinder chooses between or among competing opinions of expert witnesses, we almost never find manifest error in that choice." *McCarter*, 2009-1508, p. 5, 44 So.3d at 347. With these standards of review in mind, we turn to Mr. Gniady's and Ochsner's arguments.

## DISCUSSION

In his brief to this Court, Mr. Gniady asserts that the "differential diagnosis" standard of care applied to Ochsner; that Ochsner breached this standard of care; and that the breach of the standard of care resulted in his injuries. Mr. Gniady also writes in his brief that "Louisiana . . . [has] recognized that in medical malpractice cases sometimes the undisputed facts and circumstances point so strongly to negligence that expert testimony on the standard of care is not needed." Mr. Gniady contends that his case is one in which "the common knowledge of lay persons is sufficient to infer negligence from the undisputed facts and Ochsner should have been held negligent," thus contending that the expert testimony in this case was unnecessary.

In its brief, Ochsner does not dispute that differential diagnosis constituted the applicable standard of care but counters that Mr. Gniady failed to prove that Ochsner breached the standard of care. Further, Ochsner argues that, even if this

Court were to reach the issue of causation, Dr. Danna's treatment did not cause Mr. Gniady's injuries and damages.

### *Burden of Proof in Medical Malpractice Actions*

*What the Plaintiff Must Prove*

Mr. Gniady's Petition asserted claims of medical malpractice against Ochsner via its employee, Dr. Danna. As defined in La. R.S. 40:1231.1(A)(13), "'Malpractice' means any unintentional tort or any breach of contract based on health care . . . services rendered, or which should have been rendered, by a health care provider, to a patient . . . ." Outlining the burden of proof in medical malpractice actions, La. R.S. 9:2794 provides, in pertinent part:

> A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., . . . the plaintiff shall have the burden of proving:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
>
> . . . .
>
> C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician . . . . The jury shall be further instructed that injury alone does not raise a presumption of the physician's . . . negligence.

In discussing La. R.S. 9:2794, this Court has held that a medical malpractice plaintiff must establish the applicable standard of care and a breach of that standard of care, as well as "a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom." *McCarter*, 2009-1508, p. 2, 44 So.3d at 346 (quoting *Pfiffner*, 1994-0992, 0963, 0992, p. 9, 643 So.2d at 1233). Thus, to determine whether the trial court manifestly erred and abused its discretion in denying the motion for judgment notwithstanding the verdict and motion for new trial, respectively, we must first determine whether the jury manifestly erred or was clearly wrong in concluding that Mr. Gniady did not meet his burden of proving the applicable standard of care, breach of the standard of care, and resulting damages.

*Whether Expert Testimony Was Necessary*

Before determining whether Mr. Gniady met his burden we address Mr. Gniady's argument that his case did not require expert testimony. This Court has previously stated that a plaintiff is unlikely to meet his burden of proof under La. R.S. 9:2794 without the use of expert testimony due to "the complex factual and medical issues presented in a medical malpractice case." *Jordan v. Cmty. Care Hosp.*, 2019-0039, 0040, p. 12 (La. App. 4 Cir. 7/24/19), 276 So.3d 564, 576 (quoting *Pfiffner*, 1994-0992, 0963, 0924, pp. 9-10, 643 So.2d at 1234). Further, as this Court has previously explained, "[g]enerally, expert testimony is required 'to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony.'" *In re Boryca*, 2020-0670, 0671, 0672, 0673, p. 4, 366 So.3d at 115 (quoting *Schultz v. Guoth*, 2010-0343, p.

42

7 (La. 1/19/11), 57 So.3d 1002, 1007) (citing *Jackson v. State Through Charity Hosp. of La. at New Orleans*, 1994-2090, p. 3 (La. App. 4 Cir. 5/16/95), 655 So.2d 795, 797). This "jurisprudentially-crafted exception for obvious negligence . . . is a narrow one that applies only to 'instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can.'" *Jordan*, 2019-0039, 0040, p. 13, 276 So.3d at 576-77 (quoting *Pfiffner*, 1994-0992, 0963, 0924, p. 9, 643 So.2d at 1234).

> In *Jordan*, this Court listed examples of some such instances:

> Examples of obvious negligence include "fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body." *Pfiffner*, [19]94-0992, []0963, []0924, p. 9, 643 So.2d at 1233. Other examples include failing to attend a patient when the circumstances demonstrate the serious consequences doing so; failing of an on-call physician to respond to an emergency when he knows, or should . . . have known, his presence was necessary; and leaving a seriously injured patient to bleed to death in an emergency room. *Id.*, [19]94-0992, []0963, []0924, p. 9, 643 So.2d at 1234.

2019-0039, p. 13 (La. App. 4 Cir. 7/24/19), 276 So.3d 564, 577 n.15. In analyzing whether expert testimony was required in *Simien v. Medical Protective Co.*, the Louisiana Third Circuit Court of Appeal affirmed the trial court's finding that "the [i]ssues of the relation between any alleged failure on the part of [the doctor] to properly test [the patient], the recurrence of her cancer, and any resultant damages are complex, and we find that Plaintiffs would be required to present expert testimony to establish the elements of her case." 2008-1185, p. 5 (La. App. 3 Cir. 6/3/09), 11 So.3d 1206, 1210. Considering these examples, we disagree with Mr. Gniady's contention that his case is one in which "the common knowledge of lay persons is sufficient to infer negligence from the undisputed facts and Ochsner

should have been held negligent." As in *Simien*, we find that this case presents complex issues in which expert testimony was necessary.

### *Whether Ochsner Breached the Standard of Care*

Mr. Gniady asserts that the differential diagnosis constitutes the standard of care applicable to this case, and Ochsner does not dispute that differential diagnosis was the applicable standard of care. Based on the expert testimony adduced at the August 2022 trial, we agree that the differential diagnosis was the standard of care applicable to Dr. Danna and Ochsner. Next we turn our analysis to the issue of breach of the standard of care.

As previously summarized, Mr. Gniady argues that he proved that Ochsner and Dr. Danna breached the differential diagnosis standard of care; but Ochsner counters that Mr. Gniady failed to prove that Ochsner and Dr. Danna breached the standard of care. In a medical malpractice action, "[a] physician's duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances." *Price v. Med. Ctr. of La. at New Orleans U. Campus*, 2000-2203, p. 3 (La. App. 4 Cir. 12/5/01) 804 So.2d 743, 747 (citing *Coleman v. Deno*, 1999-2998, pp. 21-22 (La. App. 4 Cir. 4/25/01), 787 So.2d 446, 464). The standard of care is established by "the particular facts and circumstances of each case, including the evaluation of the expert testimony[;]" and, as we previously stated in this Opinion, if "the medical experts express opposing opinions on whether the standard was met in any given case, the reviewing court shall give great deference to the trier of fact's evaluations" because this is a factual issue subject to the manifest error/clearly wrong standard of review. *Fischer v. Megison*, 2007-1023, p. 12 (La. App. 5 Cir. 5/27/08), 986 So.2d 95, 101.

As extensively described in the factual and procedural section of this Opinion, Mr. Gniady's experts, Dr. Fischer, Dr. Tamkin, and Dr. Klapper, testified that they believed Dr. Danna breached the differential diagnosis standard of care. In particular, Dr. Fischer contended that, given Mr. Gniady's recent history of pain in the center of his chest during activity and an abnormal EKG, Dr. Danna should have immediately transferred Mr. Gniady to the emergency room or alternatively should have consulted a cardiologist before sending Mr. Gniady home. Dr. Fischer further contended that if Dr. Danna had prioritized Mr. Gniady's chest pain in performing the differential diagnosis, this would have resulted in a diagnosis of unstable angina, which constitutes one of three categories of acute coronary syndrome. During his testimony, Dr. Tamkin largely focused on what would have happened if Mr. Gniady went to the emergency room immediately and on how an emergency physician would have approached the differential diagnosis in Mr. Gniady's case. In this regard, Dr. Tamkin stated that acute coronary syndrome would be "number one . . . in [an] emergency physician's differential diagnosis" of Mr. Gniady. He opined that Mr. Gniady's situation "would have led any reasonable emergency physician to get a cardiology consultation and admit this patient for a high risk presentation for heart problems."

Dr. Klapper stated that, after reviewing Mr. Gniady's medical records, he believed that "Mr. Gniady should have been sent to the emergency room by Dr. Danna . . . for management of unstable angina." In addition to the instances of chest pain, Dr. Klapper stated that Mr. Gniady's age, history of hypertension, gender, cigar-smoking, and abnormal EKG were reasons Dr. Danna should have sent Mr. Gniady to the emergency room. Specifically, Dr. Klapper asserted that Dr. Danna breached the standard of care because the American College of Cardiology

guidelines state that the standard of care with a suspected acute coronary syndrome is to send the patient to the emergency room and because the "customary and usual" practice in medicine in the United States is to send patients with recent chest pain or suspected acute coronary syndrome to the emergency room. Dr. Klapper testified that after Dr. Danna identified acute coronary symptom as "Number 1 on his differential diagnosis," the standard of care was for him to send Mr. Gniady to the emergency room.

In contrast, Dr. Wilkow and Dr. Lege both testified that Dr. Danna did not breach the standard of care. Specifically, Dr. Wilkow agreed that Dr. Danna's decision to send Mr. Gniady for a stress test the following week was "reasonable and appropriate under the circumstances" and met the standard of care. He stated that Dr. Danna's actions in light of Mr. Gniady's history and physical constituted "the appropriate workup." In discussing a note in Mr. Gniady's records from the October 6, 2015 that Dr. Danna "discussed with the patient the emergency room protocol and to go to the emergency room if he has any further problems," Dr. Wilkow agreed that this was "reasonable and appropriate and in accordance with acceptable standards of care." Further, Dr. Wilkow stated that he disagreed that the standard of care required Dr. Danna to immediately send Mr. Gniady to the emergency room on October 6, 2015. Dr. Wilkow explained that he arrived at these conclusions because Mr. Gniady's descriptions of his chest pain were not consistent with angina. Dr. Wilkow agreed that Mr. Gniady's EKG showed abnormalities; however, when asked whether there was "anything in th[e] EKG that . . . [would have] raised . . . the index of suspicion for Dr. Danna that he [should have] sent Mr. Gniady to the emergency room," Dr. Wilkow responded, "No, sir." Dr. Wilkow further explained that "[t]he kind of heart attack [Mr.

46

Gniady] had . . . [is] a sudden event." Additionally, in Dr. Wilkow's opinion, Mr. Gniady's complaints of chest pain on September 30, October 1, and October 4, 2015, "were not related" to Mr. Gniady's heart attack on October 6, 2015.

Dr. Lege likewise disagreed that the standard of care required Dr. Danna to send Mr. Gniady to the emergency room immediately and instead agreed with Dr. Danna's decision to set up a stress test. Like Dr. Wilkow, Dr. Lege stated that Mr. Gniady's description of his chest pain was "not typical angina." Discussing the differential diagnosis, Dr. Lege stated that the goal would have been "to determine whether Mr. Gniady . . . [wa]s having acute coronary syndrome" but that "nothing in the visit and presentation that day met any of those criteria." Dr. Lege also stated that he did not believe the standard of care in this case required Dr. Danna to call a cardiologist on October 6, 2015.

Additionally, the jury heard testimony from Dr. Danna himself, and he also opined that "[t]he way that [Mr. Gniady] described [his chest pain] . . . was not consistent with angina." When asked whether he ruled out acute coronary syndrome during his differential diagnosis, Dr. Danna responded, "based on my history, [Mr. Gniady] did not have angina. And because he [did not] have angina, he did not have acute coronary syndrome." Dr. Danna specified that he was able to rule out unstable angina based on Mr. Gniady's presentation, history, EKG, and physical examination. Dr. Danna explained that he ruled out acute coronary syndrome but ordered the stress test to investigate whether the chest pain was cardiac or heart-related. Thus, contrary to how Mr. Gniady's experts testified, Dr. Danna asserted that he did in fact rule out acute coronary syndrome as part of his differential diagnosis.

As we delineated in our discussion about the applicable standards of care, "[i]t is axiomatic that when there is conflicting expert testimony concerning the defendant's compliance with the standard of care, the reviewing court must give great deference to the fact-finder's conclusion," and "[w]hen a factfinder chooses between or among competing opinions of expert witnesses, we almost never find manifest error in that choice." *In re Boryca*, 2020-0670, 0671, 0672, 0673, p. 8, 366 So.3d at 117 (citing *Serpas*, 2013-1590, 1591, p. 13, 161 So.3d at 736-37); *McCarter*, 2009-1508, p. 5, 44 So.3d at 347. Essentially, the jury resolved this case by choosing between the conflicting expert testimony as to whether Ochsner and Dr. Danna breached the standard of care and ultimately determined that Ochsner and Dr. Danna did not breach the standard of care. As summarized above, the testimony of Dr. Wilkow and Dr. Lege supports the jury's finding that Ochsner and Dr. Danna did not breach the standard of care. Moreover, Dr. Danna's testimony further supports the jury's conclusion. Thus, we conclude that the jury's finding is not manifestly erroneous or clearly wrong. Rather, it is based on a reasonable interpretation of the testimony and evidence. Though we listed damages and causation as the third and final element that a medical malpractice plaintiff must prove, having already concluded that the jury was not manifestly erroneous or clearly wrong that Mr. Gniady failed to prove that Ochsner and Dr. Danna breached the applicable standard of care, we need not reach the issue of damages and causation.

By logical extension, we further conclude that the trial court did not manifestly err in denying the judgment notwithstanding the verdict portion of Mr. Gniady's Motion for JNOV/New Trial and did not abuse its discretion in denying the motion for new trial portion of Mr. Gniady's Motion for JNOV/New Trial.

Despite Mr. Gniady's contentions, and for the above-stated reasons, the evidence does not point so strongly in favor of Mr. Gnaidy to justify granting a motion for judgment notwithstanding the verdict; and the verdict is based on a fair interpretation of the evidence, such that the trial court did not abuse its discretion in denying the motion for new trial. We disagree with Mr. Gniady that the jury verdict was "clearly contrary to [the] law and evidence."

## DECREE

For the foregoing reasons, we affirm the trial court's November 23, 2022 judgment, which denied Mr. Gniady's Motion for JNOV/New Trial and dismissed his claims against Ochsner with prejudice.

**AFFIRMED**